**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

Civil No. _____

**M.L.D.**, a minor, by and through
**K.C.**, foster parent and educational surrogate,
and **Maine Department of Health**
**and Human Services**, as legal guardian,
through its Office of Child and Family Services,
Todd A. Landry, Director,

Plaintiff,

v.

**Regional School Unit No. 73**,

Defendant.

**COMPLAINT**
**JURY TRIAL REQUESTED**

## I.   INTRODUCTION

1.      For much of the 2019-2020 school year, Regional School Unit No. 73

("Defendant" or "the District") removed M.L.D. ("Plaintiff" or "the Student") from his

classroom, and his school, to a segregated tutoring placement.  This removal denied him contact

with his peers and access to the educational opportunities enjoyed by his peers.  And it denied

him access to the positive behavior interventions and supports, related services, and specialized

instruction he required in order to have equal access to educational opportunity.  M.L.D. was 10

years old at the time.

2.      The manner in which Defendant imposed and extended this removal to a segregated tutoring placement violated the Student's rights under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"), and also constituted disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). In addition, Defendant's unilateral removal of the Student from his classroom and school to the segregated tutoring placement, without providing basic due process protections, violated the Student's constitutionally protected rights.

3.      The Student exhausted his administrative remedies in a hearing conducted pursuant to the IDEA, 20 U.S.C. § 1415(f), where he prevailed on a majority of the issues presented but was provided inadequate relief.

4.      Through this action, the Student seeks the partial reversal of the administrative decision and an order requiring the provision of compensatory education services sufficient to put him in the place he would have been but for Defendant's violations of the IDEA.  In addition to compensatory education, the Student seeks compensatory damages, declaratory relief, attorneys' fees and costs, and other relief arising from Defendant's actions and inactions which removed him from his classroom and school, segregated him, and denied him access to necessary services in violation of his federally protected rights.

**II.     PARTIES**

5.      M.L.D. is currently 11 years old.  During the time period relevant to this Complaint, he was in the 5th grade.  He is intelligent, creative, loves to teach people, and enjoys sharing his extensive knowledge about turtles and dinosaurs.

6.      M.L.D. is a student with a disability within the meaning of the IDEA and the ADA.  He has been diagnosed with Autism, ADHD and an adjustment disorder, and he has

social, emotional and behavioral needs related to the trauma he has experienced in his life.  As a result of his disabilities, the Student struggles with reading his environment, understanding people's reactions to him, and in reacting to others.  His disabilities impact his communication, social, emotional, and behavioral skills and substantially limit several major life activities, including learning and communicating. As a result of his disabilities, the Student has struggled significantly in school, both academically and with regard to social, emotional and behavioral domains.

7.      M.L.D. is in the custody of the Maine Department of Health and Human Services (DHHS).  This action is brought on behalf of M.L.D. by DHHS, through its Office of Child and Family Services, Todd A. Landry, Director.

8.      M.L.D. is currently placed by DHHS in the therapeutic foster home of K.C., in Veazie, Maine.  K.C. acts as the Student's surrogate parent under the IDEA, 20 U.S.C. §1415(b)(2), and brings this action on his behalf in that capacity.

9.      During the time period relevant to this Complaint, the Student lived in Jay, Maine, with his then therapeutic foster parents, who acted as the IDEA surrogate parents at those times. The change in foster placements occurred on October 21, 2020.  At that time, the responsibility to protect the Student's rights under the IDEA transferred to K.C.

10.     Regional School Unit 73, with its primary office in Livermore Falls, is the local education agency responsible for providing a free appropriate education ("FAPE") under the IDEA to children with disabilities who are residents of Jay, Maine.  And Defendant is a public entity and subject to Title II of the ADA.

11.     For the time period relevant to this Complaint, September 2019 through September 2020, Defendant was responsible for providing the Student with an education.

3

### III.    JURISDICTION

12.    This is an action commenced under the Individuals with Disabilities Education Act, as amended, 20 U.S.C. § 1400 *et seq.* ("IDEA"), supplemented by Maine's laws regarding the education of students with disabilities, 20-A M.R.S. § 7001, *et seq.*, and their implementing federal and state regulations. It involves Plaintiff's request for judicial review and partial reversal of an administrative decision.

13.    In seeking partial reversal of the administrative decision, Plaintiff is a party "aggrieved by the findings and decision" of a due process hearing within the meaning of the IDEA, 20 U.S.C. § 1415(i)(2)(A).

14.    This Court has jurisdiction over this action pursuant to the Individuals with Disabilities Education Act, based upon 20 U.S.C. §§ 1415(i)(2)(A), 1415(i)(3)(A)-(C), and 28 U.S.C. § 1331.  And this court has jurisdiction over the disability discrimination claims under Title II of the ADA, 42 U.S.C. §§ 12131-12133, and 28 U.S.C. § 1331.

15.    This action also seeks to vindicate rights guaranteed by the Fourteenth Amendment to the United States Constitution and is brought under 42 U.S.C. § 1983. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1988, as this action arises under the Constitution and laws of the United States.

16.    The Court also has the authority to grant declaratory relief and any further relief that is necessary and proper pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

17.    This Court has personal jurisdiction over Defendant because RSU 73 is a political subdivision of the State of Maine located entirely within this federal district.

18.     Venue in this district is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant is located within this district, and a substantial part of the events or omissions giving rise to the claims occurred within this district.

19.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a jury trial on all issues triable as of right by jury.

## IV.     THE IDEA ADMINISTRATIVE DECISION

20.     The administrative decision was issued on November 8, 2020, by a hearing officer appointed by the Maine Department of Education (MDOE) following a due process hearing conducted pursuant to the IDEA, 20 U.S.C. § 1415(f).  A true and redacted[1] copy of the hearing officer's decision and order is attached as Exhibit 1.

21.     The hearing officer correctly determined that the District failed to provide the Student with positive behavior interventions and supports, as required by the Student's Individualized Education Program ("IEP").  Specifically, the hearing officer wrote "the District did not provide the proper behavior interventions and supports that the Student needed in order to remain safe and keep others safe.  I find the failure to consult with a [Board Certified Behavior Analyst] and use appropriate behavior interventions was a violation of the Student's IEP."  And the hearing officer noted that once the District did use the services of a BCBA, the team developed a plan to educate the student in a classroom setting in a public school, noting "Clearly, this should have happened in the beginning of the school year."

22.     The hearing officer correctly concluded that the district failed to deliver the related services required by the Student's IEP at various times, including speech and language

---

[1] This decision was redacted by the Maine Department of Education and published on the MDOE website.  It is available at: https://www.maine.gov/doe/sites/maine.gov.doe/files/inline-files/20.068H%20Decision_Redacted.pdf

services, occupational therapy services, and social work services, services which had been determined necessary to support M.L.D. in benefiting from his special education services.

23.     The hearing officer correctly found it was undisputed the Student's foster parents did not want him to be tutored for any length of time and that the District violated the IDEA when it "unilaterally chose to remove the Student from the [public school] behavior program and place him in tutoring while an out-of-district placement could be found."

24.     But the hearing officer failed to order sufficient compensatory educational services to fully address the violations of the IDEA that were documented and determined.

25.     The hearing officer erred in validating the District's use of the expedited hearing procedures to avoid implementing the program developed by the Student's IEP team.

26.     The hearing officer further erred in determining that simply filing an expedited hearing was sufficient to alter the Student's "stay put" placement under the IDEA.

27.     Finally, the hearing officer erred in determining that the District did not violate the Student's procedural rights at the February 14, 2020, IEP team meeting when it proposed an unidentified placement that was not in fact available.

28.     The Student seeks the partial reversal of the administrative decision and an order remanding the matter back to the hearing officer with instructions to ensure the provision of compensatory education sufficient to put the Student in the place he would have been but for Defendant's IDEA violations.

## V.     ADDITIONAL FACTUAL BACKGROUND

29.     The Student experienced significant educational disruptions during the 2018-2019 school year, where he was in multiple foster and other placements. Immediately prior to moving into RSU 73, he lived within the boundaries of RSU 9.

30.     RSU 9 held an IEP meeting on July 10, 2019, and decided to refer the Student to its school-based day treatment program, to provide specially designed instruction for 1790 minutes per week, and to provide one hour per month of BCBA consultation.  The Student's IEP continued to require 30 minutes per week of speech and language, 30 minutes per week of social work, as well as monthly consultation from an occupational therapist. The Student's IEP required the use of social stories, visual supports, a behavior plan, speech to text, and adult support to: a) implement the behavior plan; b) provide differential enforcement and de-escalation strategies; and c) support the use of expected social thinking skills.

31.     The Student's former foster family moved into RSU 73. And he was enrolled on September 6, 2019.  His first day attending school in the District was September 12, 2019.

32.     On September 24, 2019, the Student was suspended for three days after he became escalated "when another student made an inappropriate comment about gay people."  He was then restrained and secluded, which escalated him further.

33.     The District convened the Student's IEP Team for the first time on September 25, 2019. At this meeting, the team determined that consultation from the BCBA would be "as needed."  The resulting IEP had an effective date of October 2, 2019, and called for 4 hours and 30 minutes each day in the District's behavior program, as well as the following related services each week: 30 minutes of social work, 30 minutes of occupational therapy, and 30 minutes of speech. The Student was to participate with non-disabled peers 19% of the time. The IEP also continued to require the use of social stories, visual supports, a behavior plan, speech to text, and adult support to: a) implement the behavior plan; b) provide differential enforcement and de-escalation strategies; and c) support the use of expected social thinking skills.

34.     On October 1, 2019, the Student became escalated when staff did not keep his iPad separate from the others. He was secluded, which escalated him more and led to the involvement of the school resource officer. He was suspended for seven additional days.

35.     On October 23, 2019, the Student became escalated when his teacher used one of his Pokemon cards as a bookmark.  This was a known trigger for the Student, who is very sensitive to people touching or moving his possessions. When the room was cleared, the Student was restrained and then secluded, which escalated him further. He used a lunch tray to break the window of the room where he was being secluded, and so he was restrained again. The Principal, in consultation with the special education director, assigned four additional days of suspension because the Student's behavior violated the school district code of conduct.

36.     During this suspension, the Student's family made clear to the District that they wanted a functional behavioral assessment so that the District could develop an appropriate behavior plan.  They also requested a 1:1 educational technician, sought more training for teachers, and were interested in other placement options within the District.

37.     On October 29, 2019, the Student's IEP Team met and determined that the behaviors in question were a manifestation of his disability. Everyone at the meeting agreed.  As a result, the IDEA required that the Student be returned to the placement from which he was removed.

38.     But the District had determined, prior to the IEP meeting, that the Student would not be returning to his classroom. Prior to the meeting, the District reached out to legal counsel to explore its options for keeping the Student out of school.  And a plan was subsequently developed, without the involvement of the Student's family, to present a "united front" that the Student needed to go to an unidentified specialized school outside the District.

39.     The District agreed to conduct a functional behavioral assessment as required. But it did not discuss or revise the Student's behavior support plan as required by the IDEA. And even though the behavior was determined to be a manifestation of the Student's disabilities, which entitled him to be returned to the placement from which he had been removed, the District refused to consider returning the Student to his placement.

40.     The only option presented at the meeting was that the Student would be receiving tutoring until an out-of-school placement could be identified.  No specific out of school program or placement was proposed at this meeting. And other than making the change to tutoring, no changes were made to the Student's IEP.

41.     The Student's foster parent and educational surrogate requested that the Student return to his classroom with additional adult support because that had been successful in the past, but this request was rejected.

42.     As it turns out, the "interim" tutoring placement lasted for months, until the schools were closed to in person instruction in March 2020 due to COVID-19.  During that time, the District never located a program with an opening for the Student and never permitted the Student to return to his classroom.

43.     The IEP Team met again on January 21, 2020. At this meeting, the team agreed to "amending his IEP to call for inclusion in the [public elementary school] behavior program for 5.5 hours a day, four days a week." This was to include occupational therapy, speech therapy, and consultation from a BCBA. And "the team agreed he should return on Thursday, January 30, [2020]". The plan included the use of the existing tutor to provide additional adult support to "assist him in his transition" for the first two weeks.

44.     The District's special education director attended this meeting and agreed with the decision of the IEP team. She even took a break in the middle of the meeting to consult with her lawyer before finalizing the agreement.  And immediately following the meeting, the District drafted, and the Parent signed, a Seven Day Waiver form, allowing the decision reached by the IEP team to begin to be implemented the following day.

45.     The Student's foster parent and social worker felt good about this decision and started to work to prepare the Student to return to school.  The Student was excited to return to his school and his classroom and began talking about the toys he would bring to share on the playground.

46.     Following this IEP Team meeting, and outside the IEP Team process, the District decided, according to its special education director, that it would use an "expedited hearing request in order to do a reverse stay put so that [the Student] would not be able to return physically to that setting at the elementary school."  This decision was made by the Superintendent of RSU 73.

47.     When he learned he could not return to school, the Student was upset because he had been excited about the return after months in a segregated setting.  When he got the news that he would remain in the isolated tutoring placement, he expressed that he felt the school had lied to him.

48.     Between the January 2020 IEP meeting where the IEP Team agreed to return the Student to his classroom, and the District's expedited hearing request, the Student did not violate the RSU 73 Student Code of Conduct. He did not receive a suspension. And he was not referred for expulsion. There had been no incidents of any kind since the Student's IEP Team had developed and agreed upon a plan to return him to his classroom.

49.     Nevertheless, the day before the Student was supposed to return, the foster parent received a voicemail from the Superintendent indicating that the Student was not to return to school the next day. And then, on the way to the Student's appointment with his therapist, where he was to learn that his mother's parental rights had been terminated, his foster parent received an email indicating the District had filed an expedited due process hearing and making clear that the Student was not to return to school as planned.

50.     The Student did not receive notice or a hearing of any kind before this unilateral removal.

51.     On information and belief, students without disabilities in the District who are removed from their schools and classrooms for more than 10 days are provided a hearing before the School Board.  On information and belief, for students without disabilities, it is the District's policy and practice to comply with Maine law, 20-A M.R.S. § 1001, Sec. 8-A and 9, regarding removals from school in excess of 10 days.

52.     The District, through its attorney, announced the unilateral removal, which was effective immediately, in an email: "during the course of the expedited hearing, [the Student] would remain in the tutorial placement he previously was in, rather than in the proposed return to the behavior program. Consequently, beginning tomorrow (Thursday), and until the hearing officer addresses the matter, [the Student's] placement will be the tutorial placement he had been attending, rather than the proposed return to the behavioral program."

53.     The District characterized its actions in its filing as follows: "This case is an effort to obtain an expedited order by the hearing officer regarding the child's current educational placement."  In filing the expedited hearing request, the District was "asking for an order that [the Student] instead be placed in an interim alternative educational setting that would reflect the

tutorial placement that he had been receiving prior to the January 21 IEP team agreement." The District captioned the action "RSU 73 v. [Student's former foster parent]".

54.     An IEP meeting was held on February 14, 2020. At this meeting, the Student continued to seek a return to the classroom as agreed at the January IEP meeting, and continued to object to tutoring. But the District did not consider returning the Student to his classroom.

55.     Instead, the District proposed placement in an unspecified special purpose private school. No representatives from any potential program were at the meeting. No one at the meeting could provide the family with information about any specific programs. And no such placement was actually available.

56.     The Student's foster parent objected to this unidentified placement. And the District issued a written notice that same day to indicate that it had "proposed interim alternative educational setting to cover any delay in placement as a result of due process."

57.     Once the Written Notice was provided to the Student's foster parent, proposing a change to the Student's placement to an unidentified and unavailable school, the burden shifted to the parent to challenge the appropriateness of the proposed placement through filing a due process hearing.  The failure to do so would have permitted the proposed change to become effective after 7 days.

58.     On February 20, 2020, the Student filed a due process hearing, contending the District denied him a FAPE, failed to educate him in the least restrictive environment, and violated various special education disciplinary and procedural protections.  In the filing, the Student asserted his "stay put" right – which should have been sufficient to secure a return to his placement in the behavior program at Spruce Mountain Elementary School, as had been agreed by the IEP team at its meeting on January 21, 2020.

59.     On February 20, 2020, the District withdrew its First Expedited Hearing, indicating "there appears [sic] not to be no reason for an expedited hearing."  The following day, February 21, 2020, the District filed its Second Expedited Hearing, which was "filed in response to the family's due process hearing request." The District captioned this second expedited filing "RSU 73 v. [Student's former foster parent]". The District requested that its new filing be consolidated with the hearing filed by the Student.

60.     The decision reached by the IEP team on January 21, 2020 was the stay put placement.  The District did not dispute this. But instead, the District indicated that instead of implementing stay put, "the District will continue to provide [the Student] with tutorial programming and related services during this expedited process."

61.     On February 28, 2020, the Student filed a response to the Complaint, a Motion to Dismiss, and a Motion regarding Stay Put. After additional briefing, the hearing officer denied the Motion to Dismiss on March 11, 2020.

62.     On March 16, 2020, the District asked to postpone the expedited due process hearing based on the state and national declaration of emergency regarding COVID-19. This Motion was granted that same day. On March 27, 2020, the District withdrew its Second Expedited Due Process Hearing, without prejudice, writing "Because classrooms remain closed due to the coronavirus crisis, as well as because of other efforts undertaken to resolve the disagreement, the District does not have a need for an expedited due process hearing at this time."

63.     A hearing on the remaining issues took place on August 3, 5, and 7, 2020, via Zoom, and the administrative decision was issued on November 8, 2020.

64.     From the time he entered the District in September 2019, until he was removed to tutoring in October 2019, the Student was in the special education behavior program for thirty-two school days. And of these, he was suspended for all or part of at least fourteen days.

65.     During the Student's time in the District's behavior program, the program was understaffed.  And District staff working with the Student were not adequately supported or trained to do so.  The teacher was in her second year of teaching. A long-term sub was hired to support the classroom but she was eventually relieved of her duties because there were times when, according to the District, she was antagonizing students and would engage in power struggles.

66.     The Student's IEP in September 2019 called for BCBA services as a related service to support a goal of increasing independent and successful emotional regulation.  And after September 2019, BCBA support was to be included as an accommodation "as needed."  But despite Parent requests to involve the BCBA, and despite conditions clearly calling for BCBA involvement, the District failed to involve the BCBA until after the March 2020 school closures.

67.     While the Student was in the behavior program, and during his time in tutoring, the District failed to provide appropriate positive behavior interventions and supports. Social stories were not used, even though they were required by the Student's IEP.

68.     The District did not collect sufficient data about the Student's behaviors to appropriately address them. And the District did not conduct a functional behavioral assessment until after it had removed the Student to a segregated tutoring placement, defeating the purpose of assessing the impacts of the environment on the Student's behavior.

69.     The District's educators and related services providers did not work together as a team to support the Student or work collaboratively to respond to and address behaviors of concern.

70.     The District did not provide, and/or failed to provide consistently, the related services included in the Student's IEP, including social work, speech and language, occupational therapy, and BCBA consultation services.

71.     If the District had provided the services and supports required by the Student's IEP, then the Student's challenging behaviors would likely have decreased.  And if the District would have provided the Student with a clear and data-based behavior plan, implemented with fidelity, this would have likely led to a reduction in behaviors of concern. But the District did not provide the services required by the Student's IEP and it failed to develop or implement an appropriate behavior plan.

72.     Tutoring was never an appropriate placement for the Student. The District knew this. It was not based on the Student's individual needs. The District's special education director testified that: "I don't think there's anybody who could straight-face argue as an educator that tutoring is the best placement for any child for a great length of time. It's not preferred."  She also testified that "this tutoring thing was just not something I wanted to have continue for any length of time and I was just cognizant – it's like having a patient who needs, you know, emergency care kind of a thing and you're just waiting for the doctor."  And she testified that "I don't think there is an educator that would say tutoring is a replacement for all, you know, a regular setting for him of course."

73.     Nevertheless, the Student was in an isolated tutoring program from October 2019 through the date in person instruction closed to all students in March 2020 due to the COVID-19

15

pandemic.  Despite knowing that it was harmful, the District intentionally removed the Student

from his classroom and school and segregated the Student from his peers for a period of

approximately 80 school days.

74.     The Student was 10 years old at the time.

75.     During tutoring, the Student did not receive any specially designed instruction.

For much of the time he was in the tutoring placement, the Student was denied access to the

related services required by his IEP, including speech therapy and occupational therapy.  During

most of this time, he was in a conference room used for school board and other meetings which

bore little resemblance to an elementary school classroom.  He had no access to peers. And his

tutors never even saw his behavior plan.

76.     From October, when the Student was placed in an "interim" tutoring placement,

through the school closures in March, there was never a place in any special purpose private

school that was available to the Student.  And no specific placement was ever proposed.

77.     The Student did not progress adequately or develop social skills and was

otherwise harmed by the segregated and isolated tutoring placement. The Student repeatedly

expressed that he wanted to be back in school and be with his friends and he indicated he missed

riding the bus and having recess.

78.     Once schools were closed to in person instruction in March 2020, the District

began to engage with the family in a meaningful way, and finally engaged the services of its

contracted BCBA, Dr. Meaghan Swan.

79.     As a result, a plan was developed, supported by the school and the family, to

return the Student to in person instruction.  The Student was to be supported within a special

education classroom at his public school, with appropriate related services and supports and ongoing consultation from a BCBA.

80.     This plan, developed by the BCBA that the District had available to it all along, is very similar to the plan the District agreed upon in January 2020 (but then initiated two administrative hearings to avoid implementing).  The plan was implemented successfully in September 2020 before the Student moved out of the District with his foster family at the time.

81.     In the five days that the plan was implemented in September 2020, the Student did not demonstrate any behaviors of concern.  And in fact, of all of the behaviors tracked, the Student demonstrated positive behaviors 100% of the time.  As the hearing officer concluded regarding the consultation with a BCBA: "Clearly, this should have happened in the beginning of the [2019-2020] school year."

## COUNT I

### (Review of Administrative Hearing Officer Decision
### Under the Individuals with Disabilities Education Act)

82.     Plaintiffs repeat the allegations set forth in all preceding paragraphs as though fully set forth herein.

83.     The IDEA, 20 U.S.C. 1400 *et seq*., was enacted to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs ("FAPE") and "to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A)-(B).

84.     In enacting the IDEA, Congress found that "the educational needs of millions of children with disabilities were not being fully met because (A) the children did not receive

appropriate educational services; [and] (B) the children were excluded entirely from the public school system and from being educated with their peers." 20 U.S.C. § 1400(c)(2).

85.     States that receive IDEA funding must ensure that children with disabilities are provided a free appropriate public education designed to meet their unique needs in the least restrictive environment. 20 U.S.C. § 1412(a)(1) & (5).  States must also develop, review, and revise an Individualized Education Program (IEP) for each eligible child with a disability. 20 U.S.C. § 1412(a)(1).

86.     The IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with the IDEA and must include, among other things, a statement of the specific services that the school will offer."  20 U.S.C. § 1414(d)(1)(A).  The IEP is developed through a team process, which includes the parents. 20 U.S.C. § 1414(d)(1)(B). And the school must put an agreed-upon IEP into effect. 20 U.S.C. § 1414(d)(2)(A)

87.     "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).  And the failure to implement a material or significant portion of an IEP constitutes a denial of FAPE. *S.D. v. Portland Public Sch.*, 2014 WL 4681036, *5 (D. Me. 2014).

88.     When a student's behavior interferes with their learning or the learning of others, then schools must consider the use of positive behavior interventions and supports.  And "a failure to provide appropriate behavioral supports (because they are not offered or because teachers and other staff are not adequately trained to implement such supports) that results in the child not receiving a meaningful educational benefit may constitute a denial of FAPE." *Dear Colleague Letter on Positive Behavioral Interventions and Supports in Individualized Education*

18

*Programs*, p. 12 (United States Department of Education, Office of Special Education and Rehabilitative Services) (August 1, 2016) *available at*: https://sites.ed.gov/idea/files/dcl-on-pbis-in-ieps-08-01-2016.pdf

89.     Removal of a child with a disability from the child's current placement in excess of 10 days constitutes a change in placement. 34 C.F.R. § 300.536.  And the core protection against improper removals of students with disabilities from their educational placement is the requirement that a manifestation determination is conducted "within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct." 20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.530(e).

90.     If the behaviors that led to the decision to change a student's placement are determined to be a manifestation of their disabilities, the district must "return the child to the placement from which the child was removed, unless the parent and the [district] agree to a change in placement as part of the modification of the behavior intervention plan." 20 U.S.C. § 1415(k)(1)(F); 34 C.F.R. § 300.530(f)(2).

91.     The IDEA requires that, during the pendency of any proceedings challenging a student's placement, unless the educational agency and the parents otherwise agree, "the child shall remain in the then-current educational placement." 20 U.S.C. § 1415(j).  This provision is designed to preserve the status quo during a challenge to a proposed change in educational placement, and is generally referred to as the "stay put" provision. *Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 3 (1st Cir. 1999). The "preservation of the status quo ensures that the student remains in the last placement that the parents and the educational authority agreed to be appropriate." *Id.*, at 10.

92.     The stay put protections under the IDEA were reflective of "Congress' unquestioned desire to wrest from school officials their former unilateral authority to determine the placement of emotionally disturbed children." *Honig v. Doe*, 484 U.S. 305, 321 (1988).

93.     Districts must provide clear, formal and specific offers of placement as a way to support meaningful parental involvement.  Courts have found "that this formal requirement has an important purpose that is not merely technical, and we therefore believe it should be enforced rigorously. The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any. Furthermore, a formal, specific offer from a school district will greatly assist parents in "present[ing] complaints with respect to any matter relating to the . . . educational placement of the child. 20 U.S.C. § 1415(b)(1)(E)." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994).

94.     "There are two types of arguments available to the parents at a due process hearing, both of which center on the denial of a FAPE. They can argue that their child is being denied a FAPE substantively, on the grounds that his or her IEP lacks certain special education or related services. 20 U.S.C. § 1415(f)(3)(E)(i).  And they can argue that their child is being denied a FAPE due to procedural violations that, for example, "significantly impede[] the parents' opportunity to participate in the [IDEA] decision-making process." *Pollack v. RSU 75*, 886 F.3d 75, 80 (1st Cir. 2018).

95.     "A procedural violation can cause substantive harm when it seriously infringes upon the parents' opportunity to participate in the IEP process." *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 857-58 (6th Cir. 2004). "Therefore, compliance with the IDEA's procedural

safeguards is essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important [and p]rocedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1195 (9th Cir. 2017) (internal citations and quotations removed).

96.     Compensatory education is available to remedy past deprivations of access to a FAPE under the IDEA. *Pihl v. Mass. DOE*, 9 F.3d 184, 189 (1st Cir. 1993). "We have recognized that, as another form of 'appropriate relief' available under § 1415(i)(2)(C)(iii), a court may require 'compensatory education' in the form of 'further services, in compensation for past deprivations' of IDEA benefits." *Mr. I. ex rel. L.I. v. Maine School Admin. Dist. No. 55,* 480 F.3d 1, 25 (1st Cir. 2007).

97.     Federal and state special education laws authorize the Court to conduct judicial review of the administrative decision and "to grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2). This authority includes the power to reverse or vacate, in whole or in part, a hearing officer's erroneous order.

98.     In this case, the hearing officer correctly concluded that the District failed to deliver the related services required by the Student's IEP. The hearing officer correctly concluded that the District violated the IDEA when it "unilaterally chose to remove the Student from the [public school] behavior program and place him in tutoring while an out-of-district placement could be found." And the hearing officer correctly concluded that this resulted in the denial of a FAPE. But the hearing officer failed to order sufficient compensatory educational services to fully address the District's violations of the IDEA.

99.     The District's unilateral assertion of authority to force the Student into in a segregated tutorial setting constituted a significant procedural violation that resulted in a denial of a FAPE.  And the hearing officer erred in determining that the District appropriately used the expedited due process hearing procedures to avoid implementing the program developed by the Student's IEP team.

100.    The hearing officer further erred in determining that the District's use of the expedited hearing proceedings altered the Student's stay put rights.

101.    Finally, the hearing officer erred in determining that the District did not violate the Student's procedural rights at the February 14, 2020 IEP team meeting.  The District's proposal of an unidentified placement that did not in fact exist seriously infringed on the right to participate in the IEP process and resulted in a proposed placement that was both substantively and procedurally deficient and resulted in a further denial of a FAPE.

102.    The Student seeks the partial reversal of the administrative decision, a declaration that the District violated his rights under the IDEA, and compensatory education services sufficient to put the Student in the place he would have been but for all of Defendant's violations of the IDEA.

## COUNT II

### (Violation of Title II of the Americans with Disabilities Act)

103.    Plaintiff re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

104.    Congress enacted the ADA to provide for the elimination of discrimination against individuals with disabilities and to provide consistent standards for identifying such discrimination. 42 U.S.C. § 12101(b)(1) & (2).

105.    Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem," 42 U.S.C. § 12101(a)(2). Congress also found that "discrimination against individuals with disabilities persists in such critical areas as . . . education." 42 U.S.C. § 12101(a)(3).

106.    Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The discrimination prohibited under Title II of the ADA includes the needless isolation or segregation of persons with disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999).

107.    Title II of the ADA applies to all of the activities of public entities, including public entities providing education.

108.    The ADA regulations make clear that it is unlawful discrimination for a public entity to:  a) "Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii); b) "Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii); and c) Fail to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d).

109.    Congress specifically provided for a private right of action to enforce Title II.  42 U.S.C. § 12133.

110.    M.L.D. is an individual with a disability within the meaning of the ADA. 42 U.S.C. § 12102. His disabilities substantially limit several major life activities, including learning and communicating.

111.    M.L.D. was qualified to participate in Defendant's educational programs and services. 42 U.S.C. § 12131(2).

112.    Defendant is a public entity within the meaning of the ADA. 42 U.S.C. § 12131(1).

113.    Through the acts and omissions described above, Defendant violated Title II of the ADA by: a) denying the Student an opportunity to participate in and benefit from educational services equal to that afforded other students; b) denying the Student educational services that were as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students; and c) denying the Student the opportunity to receive educational programs and services in the most integrated setting appropriate to his needs.

114.    Instead of providing the Student with the positive behavior interventions and supports that he needed to access his education, the District isolated and segregated him in a tutoring placement, denying him equal access to educational services and opportunities available to other students, in violation of the ADA.

115.    By segregating and isolating the Student because of behaviors that were manifestations of his disabilities, the District engaged in disability discrimination in violation of the ADA.

24

116.    And by subjecting the Student to a unilateral removal to a segregated placement by using procedures that are only applicable to students with disabilities, and by denying him access to procedures applicable to all students, the District further discriminated against the Student in violation of the ADA.

117.    Defendant's actions described in this complaint were intentional and/or were taken with deliberate indifference to Plaintiff's right to be free from discrimination.

118.    As a direct and proximate result of Defendant's acts, omissions, and violations alleged above, Plaintiff suffered damages.

## COUNT III

**(Due Process Violation Under the United States Constitution Pursuant to 42 U.S.C. § 1983)**

119.    Plaintiff realleges and incorporates by reference all allegations in the preceding numbered paragraphs.

120.    The Student has a property interest in his education created pursuant to the Maine Constitution, Me. Const. art. 8, Pt. 1, § 1 and Me. Const. art. 1, § 6-A.

121.    The Fourteenth Amendment to the United States Constitution, enforceable through 42 U.S.C. § 1983, requires the provision of due process prior to the deprivation of the right to an education.

122.    Even students denied access to an education for 10 days or less must be given notice of the charges against them and an opportunity to be heard. *Goss v. Lopez*, 419 U.S. 565, 579 (1975). Indeed, "[n]otice and an opportunity to be heard have traditionally and consistently been held to be the essential requisites of procedural due process." *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988).

123.    Defendant unilaterally removed the Student from his classroom and school to a segregated tutoring placement for a period of time well in excess of 10 days without due process.

124.    Defendant claimed the right to remove the Student without due process by filing two expedited due process hearing proceedings, but withdrawing them before a hearing was actually held.  Defendant improperly asserted through these filings, both captioned RSU 73 v. [Student's former foster parent], that the Student's federally protected rights were altered by force of law.  And Defendant claimed, and exercised, the authority to unilaterally remove the Student from his school before a hearing.

125.    The unilateral tutorial placement was substantially inferior to the education to which the Student was entitled.  The segregated placement did not address the Student's communication, social, emotional or behavioral needs.  The student did not receive specially designed instruction within the tutoring setting.  The Student was denied access to necessary related services and any and all contact with peers.  And he spent months removed from his school and isolated in a room in an administrative building that was designed for and used as a meeting space for adults.  He did not access the playground with his peers.  He did not eat in the lunchroom.  He did not participate in art or music or physical education.  And he did not have anything close to the same educational experience afforded to other 5th grade students by the Defendant.

126.    Defendant deprived the Student of his property interest in his education by asserting a unilateral right to remove him without providing an adequate opportunity to be heard prior to the removal.  And Defendant denied the Student access to the procedures applied to students without disabilities in Maine facing removal from their classrooms for more than 10 days. 20-A M.R.S. §1001, 8-A and 9.

127.    Defendant's actions and omissions caused the Student to be subjected to the deprivation of rights secured by federal law.

128.    Defendant's apparent practice of unilaterally removing students with disabilities from school and placing them on segregated tutoring placements without due process infringed upon the Student's constitutionally protected right to due process and must be declared unconstitutional to prevent future constitutional violations.

129.    As a result of Defendant's unconstitutional actions, Plaintiff suffered damages.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor, and specifically requests that the Court:

a.    Declare the District denied the Student a free and appropriate public education during the 2019-2020 school year, in violation of the IDEA;

b.    Declare that the District's use of the expedited hearing provisions to "reverse stay put," violated the IDEA, and Order the District to refrain from any similar use of the expedited hearing provisions in the future;

c.    Order the District to provide sufficient compensatory education to put the Student in the place he would have been but for its substantive and procedural violations which resulted in the denial of a free and appropriate public education from September 2019 through March 2020, or, in the alternative, remand the matter back to the hearing officer with instructions to engage an independent expert, pursuant to 34 C.F.R. § 300.502(d), to conduct an independent educational evaluation to develop a plan to provide the Student with sufficient compensatory services to address the denial of a FAPE, including harm

caused by the unilateral placement in a segregated and isolated tutorial placement for the majority of the 2019-2020 school year;

d.      Declare that Defendant engaged in disability discrimination, in violation of the Student's rights under Title II of the ADA, 42 U.S.C. § 12131, *et seq.*;

e.      Declare that Defendant's apparent practice of removing and excluding students with disabilities from school through the improper use of expedited due process filings under the IDEA, and without providing required notice and an opportunity to be heard, violated the Student's constitutionally protected due process rights;

f.      Award Plaintiff compensatory damages in an amount to be determined at trial;

g.      Award Plaintiff nominal damages;

h.      Award reasonable attorneys' fees and costs to Plaintiff as the prevailing party under the IDEA, pursuant to 20 U.S.C. § 1415(i)(3)(B), and as otherwise appropriate and permitted by law, including pursuant to 42 U.S.C. § 12205 and 42 U.S.C. § 1988; and

i.      Award such further relief as the Court may deem just and proper.


DATED: February 5, 2021                          s/ Atlee Reilly /

                                                 Atlee M. Reilly, Maine Bar #5159
                                                 areilly@drme.org
                                                 Benjamin Y. Jones, Maine Bar #5240
                                                 bjones@drme.org

                                                 **DISABILITY RIGHTS MAINE**
                                                 160 Capitol Street, Suite 4
                                                 Augusta, ME 04330
                                                 207.626.2774 ext. 220
                                                 207.621.1419 (fax)

                                                 ***Counsel for Plaintiff***