# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

---

**M.L.D.**, a minor, by and through
**K.C.**, foster parent and educational surrogate,
and **Maine Department of Health
and Human Services**, as legal guardian,
through its Office of Child and Family Services,
Todd A. Landry, Director,                                          Civil No. 2:21-cv-00046-LEW

Plaintiff/Counterclaim Defendant,

v.

**Regional School Unit No. 73**,

Defendant/Counterclaim Plaintiff.

---

## Plaintiff/Counterclaim Defendant's Memorandum of Law
## In Support of Motion for Judgment on the Administrative Record

### INTRODUCTION

Although the procedural history is complicated, the basic outlines of this dispute are

simple.  Plaintiff ("M.L.D." or "the Student"), a child with disabilities in the foster care system,

moved into Regional School Unit 73 ("Defendant" or "the District") at the beginning of the

2019-20 school year. The District failed to provide the Student with the services that he and the

law required.  Predictably, the Student engaged in behaviors disruptive to his learning and the

learning of others, leading to several suspensions and culminating in an incident on October 23,

2019.  Following this incident, the Student's special education teacher decided she was not

comfortable having the Student in her classroom.  From that date forward, until the District

moved to remote instruction due to COVID-19 in March 2020, the District took several steps, all

of them improper and offensive to the Individuals with Disabilities Education Act (IDEA) and

notions of due process, to ensure the Student did not return to his classroom.  The Student

1

obtained partial relief through an administrative hearing held pursuant to the IDEA and now seeks complete relief in this proceeding.

## PROCEDURAL BACKGROUND

The District's actions and inactions between September 12, 2019, and March 15, 2020 are at issue here. (R. vol. 1 at 36.)  The Student's foster family initially tried to utilize the individualized education program (IEP) Team process under the IDEA to address their concerns, achieving a partial resolution at an IEP Team meeting on January 21, 2020, where the District agreed to return the Student to his classroom with appropriate behavior interventions and supports. (R. vol. 4 at 563-64.)  But on January 29, 2020, the District filed an expedited due process hearing in an extraordinary challenge to the decision of its own IEP Team. (R. vol. 4 at 534-45.)  The Student immediately sought to dismiss the action, arguing that the District's use of the expedited due process hearing and its assertion of the right to "an alternate stay-put" was improper. (R. vol. 4 at 528-33.)  The Hearing Officer requested additional briefing (R. vol. 4 at 549), asked the parties to consider the issues at an IEP meeting, and set February 21, 2020, as the date for a decision on the Motion to Dismiss. (R. vol. 4 at 570.)  Following a February 14, 2020, IEP meeting, counsel for the Student notified the Hearing Officer that the parties had not reached an agreement and indicated the Student would likely be challenging the placement proposed by the District through a due process hearing. (R. vol. 4 at 571.)

On February 20, 2020, the day before a decision on the Motion to Dismiss was due, the District withdrew its first expedited hearing request, indicating it was no longer necessary. (R. vol. 4 at 580.)  That same day, the Student filed a due process hearing to challenge, among other things, the proposed placement in an unidentified and unavailable school and program. (R. vol. 4 at 581-93.)  On February 21, 2020, the District filed its second expedited hearing, which was

"filed in response to the family's due process hearing request", and requested consolidation. (R. vol. 4 at 599-609.)  Again, the District asserted that simply filing this action would keep the student out of his classroom. (R. vol. 4 at 608.)  On February 28, 2020, the Student filed a response to the complaint, a motion to dismiss, and a motion regarding stay put. (R. vol. 4 at 609-65.)  After additional briefing (R. vol. 4 at 666-82), the Hearing Officer denied the motions on March 11, 2020. (R. vol. 4 at 686-703.)

On March 16, 2020, the District asked to postpone the expedited due process hearing due to the declaration of emergency regarding COVID-19. (R. vol. 4 at 704-06.)  The motion was granted. (R. vol. 4 at 708.)  On March 27, 2020, the District withdrew its second expedited due process hearing "[b]ecause classrooms remain closed as a result of the coronavirus crisis, as well as because of other efforts undertaken to resolve the disagreement, the District does not have a need for an expedited due process hearing at this time." (R. vol. 4 at 711.)

The Student's claims were heard in an administrative hearing in August 2020, and a decision was issued November 8, 2020. (R. vol. 1 at 2.)  The Student prevailed on three issues which are not before the Court.  Specifically, the Hearing Officer found that the District failed to provide "the proper behavior interventions and supports the Student needed in order to remain safe and keep others safe" and that "the failure to consult with a [Board Certified Behavior Analyst] and use appropriate behavior interventions was a violation of the Student's [Individualized Education Program]." (Id. at 37-38.)  The Hearing Officer also found that the District failed to deliver the related services contained within the Student's IEP, including social work services, speech and language services and occupational therapy services. (Id. at 39.)  And the Hearing Officer found that the failure to provide the services required by the Student's IEP resulted in the denial of a free and appropriate public education (FAPE). (Id. at 52.)  In addition,

the Student prevailed on another issue, when the Hearing Officer found that the District's unilateral placement of the Student in a segregated tutoring placement for behaviors that were manifestations of his disabilities was a violation of the IDEA. (Id. at 41.)  This determination is the subject of Defendant's counterclaim.

The Student initiated this action to seek an independent review of portions of the Administrative Decision, including the Hearing Officer's failure to order adequate relief for the violations that were found, as well as the conclusions that the District's use of the expedited due process procedures to effect a unilateral removal, and the District's proposal of an unidentified and unavailable placement, did not violate the IDEA. The Student brought claims pursuant to the IDEA as well as claims arising under the Americans with Disabilities Act and the United States Constitution ("the related claims").  The related claims were set aside pending resolution of the IDEA claims, which are briefed here and will be decided on the administrative record.

## FACTUAL BACKGROUND

For the time period relevant to this Complaint, M.L.D was ten years old, in the fifth grade, and lived within the boundaries of RSU 73 with his Foster Parents. (R. vol. 9 at 15.) M.L.D. is intelligent, creative, loves to teach people, and can tell you anything there is to know about turtles and dinosaurs. (R. vol. 9 at 28; R. vol. 10 at 216, 220.)  M.L.D. has multiple disabilities and has been eligible for and received special education services from an early age (R. vol. 3 at 380-81; vol. 5 at 738.)  He has been diagnosed with Autism, ADHD, and an adjustment disorder. (R. vol. 10 at 219.)  He struggles academically, especially with regard to writing and reading. (R. vol. 5 at 765-67.)  And he struggles with reading his environment, understanding people's reactions to him, and reacting to others. (R. vol. 9, at 29; R. vol. 10 at

216.)  Given his traumatic past, placing hands on him will escalate his behaviors. (R. vol. 10 at 217, 218.)

M.L.D experienced several educational disruptions during the 2018-19 school year, when he was in multiple foster and other placements. (R. vol. 5 at 849, 851, 887.)  Immediately prior to moving into the District in September 2019, he lived within the boundaries of Regional School Unit 9.  RSU 9 conducted an Individualized Education Program (IEP) meeting on May 24, 2019 and determined "a self-contained program addressing mental health and functional communication skills is appropriate for [the Student] in order for him to make progress in his education". (R. vol. 5 at 849.)  The IEP developed at this meeting called for 30 minutes per week of speech and language, 30 minutes per week of social work, monthly occupational therapy consultation, and specially designed instruction 6 hours per day. (R. vol. 5 at 849.)  The IEP required the provision of social stories, speech to text, visual supports, a behavior plan and adult support to implement the behavior plan, provide differential enforcement and de-escalation strategies, and support the use of expected social thinking skills. (R. vol. 5 at 849.)  The IEP also called for a behavior specialist to support the development and implementation of a behavior support plan. (R. vol. 5 at 869-70.)  RSU 9 held another IEP meeting on July 10, 2019 and placed the Student in its school-based day treatment program, with specially designed instruction for 1790 minutes per week and one hour per month of BCBA consultation in addition to the other related services outlined above. (R. at vol. 5, 884-87; R. at vol. 9, 19.)

The Student's first day of school in the District was September 12, 2019. (R. vol. 5 at 891; R. vol. 6 at 1103.)  On September 24, 2019, the Student was suspended for three days after he became escalated "when another student made an inappropriate comment about gay people". (R. vol. 5 at 918.)  He was restrained and secluded, which escalated him further. (R. vol. 5 at

917-20.)  The District convened the Student's IEP Team for the first time on September 25, 2019. (R. vol. 5 at 921.)  At this meeting, the District determined that consultation from the BCBA would be "as needed". (R. vol. 5 at 921-24, 931.)  The resulting IEP had an effective date of 10/2/2019 and called for 4 hours and 30 minutes daily in the District's behavior program, and 30 minutes of social work, 30 minutes of occupational therapy, and 30 minutes of speech weekly. (R. vol. 5 at 922.)  The IEP provided 4.5 hours of specially designed instruction each day (R. vol. 5 at 922), and indicated the Student would participate with non-disabled peers 19% of the time. (R. vol. 5 at 932.)  The IEP also continued to require the use of social stories, visual supports, a behavior plan, speech to text, and adult support to implement the behavior plan. (R. vol. 5 at 921-32.)

On October 1, 2019, the Student became escalated when staff did not keep his iPad separate from the others. (R. vol. 5 at 935, 940.)  He was secluded, which escalated him and led to the involvement of the school resource officer. (R. vol. 5 at 935.)  The Student was suspended for 7 days. (R. vol. 5 at 940.)  On October 22, 2019, another behavioral incident resulted in a seclusion and involvement of the resource officer at school. (R. vol. 5 at 941-42.)  And on October 23, 2019, the Student became escalated when his teacher used one of his Pokémon cards as a bookmark, (R. vol. 5 at 946.), even though she had created a document that made clear that touching his belongings was a "huge trigger" for him. (R. vol. 5 at 898.)  When the room was cleared, the Student was restrained and then secluded, which escalated him. (R. vol. 5 at 945-46.)  He used a lunch tray to break the window of the room where he was being secluded, so he was restrained again. (R. vol. 5, 945-46.)  The Principal, in consultation with the special education director, assigned a four-day suspension. (R. vol. 11 at 489.)  During this suspension, the Student's family made clear that they wanted a functional behavioral assessment to develop an

appropriate behavior plan, requested a one-to-one educational technician, which had been successful in the past (R. vol. 9 at 25), sought more training for teachers, and were interested in other placement options within the District. (R. vol. 8 at 1628.)  But after this incident, the Student was never permitted to return to his classroom. (R. vol. 11 at 490.)

On October 29, 2019, the Student's IEP Team met and determined that the behaviors in question were a manifestation of his disabilities. (R. vol. 5, 948-49; R. vol. 10 at 310.)  The District agreed to conduct a functional behavioral assessment. (R. vol. 5 at 949.)  However, the District did not discuss or revise the Student's behavior support plan. (R. vol. 5 at 949-50.)  Even though the behavior was determined to be a manifestation of the Student's disabilities, the District did not consider returning the Student to his placement. (R. vol. 5 at 949-50.)[1]  The only option presented for the Student to continue his education was a tutoring placement while the District sought an unidentified and unavailable out of district placement. (R. vol. 5 at 948-50; R. vol. 9 at 40-41; R. vol. 11 at 592.)  No one at the meeting indicated that the Student could return to his classroom and the family had to "argue to have the tutoring happen at the school building because originally we were told that the tutoring had to happen outside the school building for less hours." (R. vol. 9 at 44, 100, 115-16.)  The Foster Parent's testimony on this point was not called into question by the District's witnesses. (R. vol. 10, 311-14, 384; R. vol. 11, 535-37, 592.)[2]  The Foster Parent signed a seven-day waiver because they understood that if they did not,

---

[1] Although the Written Notice indicates that the District rejected the request for a one-to-one educational technician in the current placement (R. vol. 5 at 950), the District did not actually consider this request, likely because the District was already trying to hire an additional educational technician, without success. (R. vol. 11 at 543.)

[2] In fact, an email that was not disclosed prior to hearing, despite being covered by a subpoena, makes clear that the District had decided, prior to this meeting, that the Student would not return to his classroom. (R. vol. 12, 1810.)(email from the Student's teacher to the Principal indicating "[the special education director] was really hoping you could join us for [the Student's] meeting tomorrow…She said that having more than one administrator will be a good way to show that *we have a united front and agree* this is what [the Student] needs.")(emphasis added) *See also* (R. vol. 12 at 1809.)

the Student "wouldn't have been able to return back for tutoring." (R. vol. 9 at 43-44, 48 115, 117-20; R. vol. 8 at 1632, 1650.)  And the Hearing Officer found that it was "undisputed that the Foster Parents did not want the Student to be tutored for any length of time." (R. vol 1 at 41.) No specific out of school program or placement was proposed at this meeting and no changes, beyond the unilateral tutoring placement, were made to the Student's IEP. (R. vol. 5 at 949.)  The "interim" tutoring placement lasted for months, until the schools were closed to in person instruction in March 2020 due to COVID-19. (R. vol. 11 at 592.)

The IEP Team next met on January 21, 2020, to review the Student's programming. (R. vol. 6 at 1016-20.)  At this meeting, the Team agreed to "amending his IEP to call for inclusion in the SMES behavior program for 5.5 hours a day, four days a week," plus occupational therapy, speech therapy, and consultation from a BCBA. (R. vol. 6 at 1014, 1017.)  The IEP Team agreed the Student would return to school on Thursday, January 30, 2020. (R. vol. 6 at 1017.)  And the Team developed a plan to utilize the existing tutor as additional adult support for the first two weeks. (R. vol. 6, at 1017; R. vol. 9 at 65; R. vol. 6 at 1016-20).  The special education director attended this meeting and agreed with the decision. (R. vol. 11 at 555; Compl. ¶44; Answer, ¶ 44.)  The Foster Parent signed a Seven Day Waiver form, allowing the decision reached by the IEP Team to be implemented the following day. (R. vol. 6 at 1014.)  The Foster Parents and the Student's providers felt good about this decision and started to work to prepare him to return to school. (R. vol. 9 at 65-66; R. vol. 3 at 365.)  The Student was excited and began thinking about which toys he would bring to share on the playground. (R. vol. 9 at 67.)

But the day before the Student was to return to his classroom, the Special Education Director emailed the Foster Parent about safety concerns and asked for another IEP meeting. (R. vol. 8 at 1733.)  The Foster Parent asked for the concerns in writing, but they were never

provided. (R. vol. 8 at 1733; R. vol. 9 at 68.)  Later that day, the foster parent received a voicemail from the Superintendent indicating that the Student was not to return to school, despite the recent IEP Team agreement. (R. vol. 9 at 69.)  Then, on the way to the Student's therapy appointment, where he was to learn that his biological mother's parental rights had been terminated, the Foster Parent received an email indicating the District had filed an expedited due process hearing and the Student could not return to his classroom (R. vol. 9 at 69). This was very upsetting to the Student. (R. vol. 9 at 70; R. vol. 10 at 226-27; R. vol. 3 at 364.)

There had been no behavioral incidents of any kind since the Student's IEP Team had developed a plan to return him to his classroom. (R. vol. 9 at 70; R. vol. 11 at 492.)  Between the January IEP meeting and the District's expedited hearing request, the Student did not violate the District's Code of Conduct, did not receive a suspension, and was not referred for expulsion. (R. vol. 11 at 492; Compl. ¶48; Answer, ¶ 48.)  At hearing it became clear that the District decided, outside the IEP Team process, that it planned to override the decision of its own IEP Team and prevent the Student from returning to his classroom. (R. vol. 11 at 483, 491-93 and 558).  And the District, through its attorney, asserted that simply filing the expedited hearing was sufficient to prevent implementation of the last agreed upon IEP. (R. vol. 4 at 542, 543, 545).

An IEP meeting was held on February 14, 2020. (R. vol. 6 at 1049.)  The Student, through his Foster Parent, continued to seek a return to the classroom as agreed at the January IEP meeting, and continued to object to tutoring. (R. vol. 6 at 1051.)  However, the District did not meaningfully consider the request. (R. vol. 9, 72, 109-10, 113, and 131.)  Instead, the District proposed placement in a special purpose private school even though no representatives from any program were at the meeting. (R. vol. 9 at 72.)  No one at the meeting was able to tell the Foster Parent about any specific programs. (R. vol. 9 at 72-73.)  Furthermore, no such placement was

actually available. (R. vol. 11 at 516, 571-72, 592, 595-96, 598-99; R. vol. 8, at 1655; R. vol. 9 at 47, 72, 76, 114; R. vol. 10 at 389.)  But the District immediately issued a Written Notice to indicate that it had "proposed placement in private special purpose behavior program". (R. vol. 6 at 1050.)  And the proposed IEP simply states that the Student will receive 6 hours of instruction per day, 5 days per week in a "Special Purpose Private School." (R. vol. 6 at 1134.)  In fact, from October 2019, when the Student was placed in an "interim" tutoring placement, through the school closures in March 2020, there was never an opening at any special purpose private school available to the Student. (R. vol 11 at 583-86.)  The Student's Foster Parent objected to this unidentified placement. (R. vol. 12 at 1772, 1795; R. vol. 8 at 1650).

From the time the Student entered the District in September 2019 until he was removed to tutoring in October 2019, he was enrolled in the special education behavior program in the District for thirty-two days.  Of those, he was suspended for all or part of at least fourteen days. (R. vol. 6 at 1103-04; R. vol. 11 at 613.)  During the Student's time in the District's behavior program, the program was understaffed and unsettled. The teacher was in her second year of teaching and had been directed to change classroom models after school started. (R. vol. 9 at 137, 144-45; R. vol. 10 at 263).  There were staffing concerns, and the substitute hired to address them was "antagonizing" students. (R. vol. 10 at 249, 360-62, 390, 441, 491; R. vol. 11 at 522, 543.)  And District staff working with the Student were not adequately supported or trained to work with the Student. (R. vol. 9 at 37, 157-58.)

The Student's IEP in September 2019 called for Board Certified Behavior Analyst (BCBA) support as a related service to support a goal of increasing independent and successful emotional regulation. (R. vol. 5 at 841.)  After September, BCBA support was included as an accommodation "as needed." (R. vol. 5 at 923.)  However, despite specific requests to do so (R.

vol. 9 at 33-34; R. vol. 8 at 1618, 1626, 1631), the District failed to involve its contracted BCBA until after the March school closures, resulting in a failure to provide appropriate student specific individualized behavioral supports. (R. vol. 9, at 23, 80, 96, 138, 142, 186; R. vol. 10 at 250, 387, 440; R. vol. 11 at 570, 576-77.)  Social stories were not used, even though they were in the IEP. (R. vol. 10, 319, 383.)  And the Student's tutors never even saw his behavior plan. (R. vol. 9, 157-58.)  The District did not collect sufficient data about the Student's behaviors to appropriately address them. (R. vol. 9 at 147-48, 156, 170, 181; R. vol. 10 at 279-80, 298-99, 367.)  District staff did not work together as a team to support the Student or work collaboratively to respond to and address behaviors of concern and instead they were operating in silos. (R. vol. 6 at 1114; R. vol. 9 at 148-49, 153, 155, 161-63.)  The District did not provide, and/or failed to provide consistently, the related services dictated in the Student's IEP, including social work, speech and language therapy, occupational therapy, and BCBA consultation services. (R. vol. 3 at 466; R. vol. 8, at 1650, 1692, 1695; R. vol. 9 at 61, 159; R. vol. 10 at 376-77; R. vol. 11, 546-50; R. vol. 12, at 1788, 1823.)  The Student was harmed by this failure. (R. vol. 9 at 26-7, 139-40, 226.)  If the District had provided the services and supports required by the Student's IEP with fidelity, then the Student's challenging behaviors would have likely decreased. (R. vol. 9 at 192, 200; R. vol. 10 at 454.)

Tutoring was never an appropriate placement for the Student, and it was not based on the Student's individual needs, but instead on the District's perceived need to remove the Student from his classroom.[3] (R. vol. 8 at 1649, 1656; R. vol 10 at 372-73; R. vol. 11 at 538, 587, 592, 598-99.)  During tutoring, the Student did not receive any special education services. (R. vol. 10

---

[3] In fact, at an IEP meeting on May 10, 2019, the Student's previous school district explicitly rejected tutoring, concluding, appropriately, that the Student "needs to participate in learning with peers in order to access FAPE in the least restrictive environment for him." (R. vol. 5, at 844.)

at 390; R. vol. 11, at 589-90.)  The Student was harmed by the tutoring placement. (R. vol. 9, 49-50, 81, 86, 164-65; R. vol. 10, at 222-25; R. vol. 3, at 366-67; R. vol. 11, at 600-01.)  And the Student wanted to be back in school to be with his friends and missed riding the bus and having recess. (R. vol. 9, at 55; R. vol. 10, at 225.)

Once schools were closed to in person instruction in March 2020, the District finally engaged the services of its BCBA, Dr. Meaghan Swan. (R. vol. 11 at 577.)  As a result, a plan was developed, supported by the school and the family, to return the Student to in person instruction in his public school. (R. vol. 6 at 1140; R. vol. 9 at 82-85, 167; R. vol. 10 at 230; R. vol. 11 at 577.)  This plan, developed by the BCBA who had been available to the District all along, is very similar to the plan the IEP Team agreed on in January 2020 that the District refused to implement. (R. vol. 11 at 603.)  This plan was implemented successfully in September of 2020. (Compl. ¶ 80; Answer, ¶ 80.)  But with a change in foster placements, the Student subsequently moved out of the District. (R. vol. 1 at 25.)

## STANDARD OF REVIEW

A party aggrieved by an administrative decision under the IDEA can seek judicial review. 20 U.S.C. § 1415(i)(2)(A).  The district court reviewing the administrative record makes "an independent ruling based on the preponderance of the evidence." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 35-36 (1st Cir. 2012); 20 U.S.C. § 1415(i)(2)(C).  Due weight must be given to the administrative proceedings, and "[a]lthough the exact quantum of weight is subject to the district judge's exercise of informed discretion, the judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." *Lenn v. Portland Sch. Committee*, 998 F.2d 1083, 1987 (1st Cir. 1993).  "[T]he duty of an 'involved oversight' requires that the court make an independent judgment on the relevance (or credibility) of the

measures in dispute." *Doe v. Cape Elizabeth Sch. Dist.*, 832 F.3d 69, 83 (1st Cir. 2016).  At

bottom, in exercising this involved oversight, "the persuasiveness of a particular administrative

finding, or the lack thereof, is likely to tell the tale." *Lenn*, 998 F.2d at 1087.

## ARGUMENT

### I.     The Hearing Officer correctly determined that the District unilaterally removed the Student to a tutoring placement in October 2019, in violation of the IDEA.

The Hearing Officer found, correctly, that the District violated the IDEA in October 2019

when, after determining the Student's behaviors were a manifestation of his disabilities, (and

instead of updating his behavior plan, and returning him to his educational placement as *required*

by the IDEA), it "unilaterally chose to remove the Student from the SMES behavior program and

place him in tutoring while an out-of-district placement could be found." (R. vol 1. at 41).  And

the Hearing Officer found, correctly, that it was "undisputed that the Foster Parents did not want

the Student to be tutored for any length of time." (R. vol. 1 at 41).  Defendant challenged this

aspect of the ruling.  Defendant's arguments will be addressed once they have been fully briefed.

But briefly, removal of a child with a disability from the child's current placement in

excess of 10 days constitutes a change in placement. 34 C.F.R. §300.536.  And the core

protection against improper removals of students with disabilities from their educational

placements is the requirement that a manifestation determination is conducted "within 10 school

days of any decision to change the placement of a child with a disability because of a violation of

a code of student conduct." 20 U.S.C. §1415(k)(1)(E); 34 C.F.R. 300.530(e).  The manifestation

determination process requires the IEP Team to determine whether the behavior that prompted

the removal had "a direct and substantial relationship to the child's disability." 20 U.S.C.

§1415(k)(1)(E); 34 C.F.R. 300.530(e).  If the behaviors that led to the removal are determined to

be a manifestation of a child's disabilities, the district *must* "return the child to the placement

from which the child was removed, unless the parent and the [district] agree to a change in placement as part of the modification of the behavior intervention plan." 20 U.S.C. §1415(k)(1)(F); 34 C.F.R. 300.530(f)(2).  And, in a provision central to the arguments in Section II below, the IDEA makes clear that if the behavior is not a manifestation of the student's disabilities, then "school personnel may apply the *relevant disciplinary procedures to children with disabilities in the same manner and for the same duration as the procedures would be applied to children without disabilities.*" 34 C.F.R. §300.530(c)(emphasis added).

In this case, the District went through some of the statutorily required motions in October 2019.  But since it had decided before the meeting that the Student would be removed from his classroom, and because it presented segregated tutoring as the *only* option for the Student to receive *any* education, it violated the Student's procedural rights under the IDEA.  The District's actions here were similar to those of the school officials in *Community Consolidated Sch. Dist. #93 v. John F.*, 33 IDELR 210, *13 (N.D.Ill.2000)[4], where the court concluded:

> Instead of following the proper procedure for removing a child believed to be dangerous from the school...[the district] removed him from school after presenting [the parent] with no options other than removal...the result was a combination of a disciplinary action and special education procedures with limited attention to special education rights which was far more focused on getting [the student] out of school than on protecting his rights under the IDEA.

*Id.* Like in *John F.*, the District's manifestation determination was an empty exercise, stripped of its legal significance, because although the IDEA *required* the Student to be returned to the placement from which he was removed, that was never even considered.  The only option presented at the October 2019 IEP meeting was for the Student to receive segregated tutoring on an "interim" basis, while the District searched for an out of district placement.  The family reasonably believed that agreeing to tutoring was the only way to get the Student any educational

---

[4] This decision is attached as <u>Exhibit 1</u>.

services and, choosing between some limited segregated educational services and nothing at all, chose the only option presented by the District.  The testimony from the family on this point was clear and was not called into question by the District, which had formed a plan, going into the meeting, to present a "united front" with regard to removing the Student from school.  The Hearing Officer correctly concluded that the IDEA required more.

## II. **The District's use of the IDEA expedited due process proceedings to override the January 2020 decision of its own IEP Team violated the Student's federally protected rights.**

Following an IEP Team decision in January 2020 to return the Student to his classroom with appropriate supports, the District filed, then withdrew, two expedited due process hearings, asserting the act of filing was enough to change the Student's last agreed upon educational placement and keep him out of his classroom.  The Hearing Officer concluded that an expedited due process hearing was sufficient to alter the Student's "stay put" placement under the IDEA, concluding, that "by force of law, the stay-put placement was the [interim alternative educational setting]." (R. at 46).  In doing so, the Hearing Officer failed to meaningfully engage with Plaintiff's arguments and adopted an interpretation of the IDEA that is contrary to its text, structure, and purpose, and would put the IDEA in conflict with the Americans with Disabilities Act (ADA) and the United States Constitution.  This was clear error.

### A. *Expedited due process proceedings under the IDEA are only available in the context of school disciplinary removals.*

The language the District relied on to override the January 2020 decision of its own IEP Team to return the Student to school can be found in 20 U.S.C. § 1415(k).  Specifically, the District relies on the following:

> **(3) Appeal**
> **(A) In general**
> The parent of a child with a disability who disagrees with any decision regarding placement, or the manifestation determination under this subsection, or a local

> educational agency that believes that maintaining the current placement of the
> child is substantially likely to result in injury to the child or to others, may request
> a hearing. 20 U.S.C. § 1415(k)(3)(A).

The District argues that this provision stands alone and apart from its statutory context, and that

these expedited proceedings are available to school districts in *any* circumstances, even the

unusual ones here, where school administrators assert the unilateral authority to override an IEP

Team decision.  But this provision cannot be used to challenge ordinary placement decisions

made by the IEP Team.  And a review of these provisions of the IDEA makes clear that they are

designed to be used in the context of school disciplinary matters when generally applicable

disciplinary procedures are invoked, triggering IDEA disciplinary protections.  As a result, the

expedited proceedings were simply not available to the District because the Student was not

facing suspension, expulsion or other sanctions due to a violation of a student code of conduct,

and no generally applicable disciplinary procedures were applied to the Student following the

January 2020 IEP Team agreement to return him to his classroom.

The IDEA contains a detailed set of procedural safeguards related to disciplinary changes

in placement.  A review of these provisions of the IDEA makes two things clear: 1) they apply in

situations where a student has violated a student code of conduct; and 2) they function as a

limitation on, not an expansion of, the authority of school administrators to apply generally

applicable disciplinary procedures to children with disabilities.  20 U.S.C. § 1415(k)(1), titled

"Authority of School Personnel," contains several statements outlining the authority of school

administrators, all of which refer to a violation of a student code of conduct and several of which

refer to generally applicable disciplinary procedures. See: 20 U.S.C. § 1415(k)(1)(A)("School

personnel may consider any unique circumstances on a case-by-case basis when determining

whether to order a change in placement for a child with a disability **who violates a code of**

**student conduct**")(emphasis added).; 20 U.S.C. § 1415(k)(1)(C).[5]  The language related to the

provision of services in an interim alternative educational setting also references removals due to

behaviors and the provision of behavioral supports to address the behavioral violation so it does

not recur. 20 U.S.C. § 1415(k)(1)(D).  The manifestation determination language in this section

also relates to disciplinary removals for violations of a student code of conduct. See: 20 U.S.C. §

1415(k)(1)(F)("If the local educational agency, the parent, and relevant members of the IEP Team

make the **determination that the conduct was a manifestation of the child's disability**, the IEP

Team shall," among other things, conduct a functional behavioral assessment, review the

behavioral intervention and "return the child to the placement from which the child was removed,

unless the parent and the local educational agency agree to a change of placement as part of the

modification of the behavioral intervention plan.")(emphasis added).[6] The language regarding

notification also refers explicitly to disciplinary actions. See: 20 U.S.C. § 1415(k)(1)(H) (Not later

than the **date on which the decision to take disciplinary action is made**, the local educational

agency shall notify the parents of that decision, and of all procedural safeguards accorded under

---

[5] See also: 20 U.S.C. § 1415(k)(1)(B)("School personnel under this subsection may remove a child with a disability **who violates a code of student conduct** from their current placement to an appropriate interim alternative educational setting, another setting, or suspension, for not more than 10 school days (**to the extent such alternatives are applied to children without disabilities**") (emphasis added); )(If school personnel seek to order a change in placement that would exceed 10 school days and **the behavior that gave rise to the violation of the school code** is determined not to be a manifestation of the child's disability pursuant to subparagraph (E), the **relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner and for the same duration in which the procedures would be applied to children without disabilities**, except as provided in section 1412(a)(1) of this title although it may be provided in an interim alternative educational setting.")(emphasis added).

[6] See also: 20 U.S.C. § 1415(k)(1)(E)("Except as provided in subparagraph (B), within 10 school days of any decision to change the placement of a child with a disability **because of a violation of a code of student conduct**, the local educational agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine--(I) **if the conduct in question** was caused by, or had a direct and substantial relationship to, the child's disability; or (II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.")(emphasis added);

this section."(emphasis added)[7]  In sum, these provisions of the IDEA only apply to disciplinary proceedings, where school administrators seek to discipline a student just as they would a student without disabilities, triggering the disciplinary protections in the IDEA.  They are not available to challenge ordinary IEP Team decisions.

The IDEA regulations and related guidance from the United States Department of Education (USDOE) support the conclusion that the IDEA expedited hearing procedures are available only in the context of disciplinary changes in placement, and that they generally limit, not expand, the ability of school officials to remove students with disabilities from school.  The regulations implementing the IDEA contain a section subtitled "Discipline Procedures". See: 34 C.F.R. §§ 300.530 - 300.537.  Aligning with the statutory authority, all of these procedures contemplate a situation when school officials seek to remove a child from their educational placement for violations of a code of conduct.[8]  And USDOE Guidance makes clear that the expedited hearing procedures are for disciplinary matters:

"*Question E-1: What is an expedited due process hearing?* Answer: An expedited due process hearing is a hearing involving a due process complaint regarding a **disciplinary** matter…The shortened timelines for conducting

---

[7] There are several exceptions to the manifestation determination protections for disciplinary removals involving weapons, illegal drugs and the infliction of serious bodily injury. See: 20 U.S.C. § 1415(k)(1)(G).  But these provisions are not at issue here.

[8] See: 34 C.F.R. §§ 300.530(b)("School personnel under this section may remove a child with a disability **who violates a code of student conduct** from his or her current placement to an appropriate interim alternative educational setting, another setting, or suspension, for not more than 10 consecutive school days (**to the extent those alternatives are applied to children without disabilities**), and for additional removals of not more than 10 consecutive school days in that same school year **for separate incidents of misconduct** (as long as those removals do not constitute a change of placement under § 300.536)"); and 34 C.F.R. §§ 300.530(b)("For disciplinary changes in placement that would exceed 10 consecutive school days, if the **behavior that gave rise to the violation of the school code** is determined not to be a manifestation of the child's disability pursuant to paragraph (e) of this section, school personnel **may apply the relevant disciplinary procedures to children with disabilities in the same manner and for the same duration as the procedures would be applied to children without disabilities**, except as provided in paragraph (d) of this section.")(emphasis added); 34 C.F.R. § 300.532(a).

expedited due process hearings in **disciplinary** situations should enable hearing officers to make prompt decisions about **disciplinary** matters…".[9]

Finally, even the form developed by MDOE, which the District used to file both of its expedited hearings, makes clear that these proceedings are reserved for disciplinary changes of placement, by including the following on the first page "**Expedited hearings are reserved for issues involving a disciplinary change of placement (e.g., suspension)."** (R. vol 4 at 534, 600).  The language the District relies on for its radical assertion of unilateral authority should be considered in light of this statutory structure and context.

20 U.S.C. § 1415(k)(3), titled "Appeal", contains the language that the District has relied on to file two expedited due process hearings in this case, even though there was no violation of a student code of conduct, no suspension or expulsion, no manifestation determination, and no use of generally applicable disciplinary procedures following the January 2020 decision of the IEP Team to return the Student to his classroom.  In proper statutory context, this provision provides for expedited due process hearings after: a) school personnel decide to order a change in placement for a student who violates a code of conduct (20 U.S.C. § 1415(k)(1)(A)); and b) a manifestation determination is conducted related to a decision to change a student's placement due to a violation of the student code of conduct beyond 10 days (20 U.S.C. § 1415(k)(1)(E)). After these steps are taken, and depending on the outcome of the manifestation determination, there is a right to appeal for either the parent or the school district. 20 U.S.C. § 1415(k)(3).  On the one hand, if a parent disagrees with a determination that the behavior was not a manifestation

_____

[9] "Dispute Resolution Procedures Under Part B of the Individuals with Disabilities Education Act" United States Department of Education, Office of Special Education Programs, at Section E, pp. 70-74 , (July 23, 2013)(emphasis added) *available at*:
https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/acccombinedosersdisputeresolutionqafinalmemo-7-23-13.pdf  <u>Note</u>: The expedited hearings guidance is found at pages 70-74 of the document, but this section restarts the page numbers as pp. 1-5.

of a student's disabilities, they can appeal this through an expedited proceeding. On the other hand, if the school is concerned that the determination that the behavior was a manifestation of the student's disability, and the concomitant requirement to return the student to the placement from which they were removed (20 U.S.C. § 1415(k)(1)(F)), would result in a substantial likelihood of injury to the student or others, then the school may appeal and seek an expedited proceeding. Under the District's strained interpretation of this provision, which it claims gives it the right to proceed to an expedited hearing even in the absence of a violation of a code of conduct and the use of generally applicable disciplinary procedures, the word appeal has no meaning and all statutory context is to be ignored. This interpretation is not aligned with the text and structure of the IDEA and should be rejected. The decision of the Hearing Officer to the contrary was in error.

The Fifth Circuit, in *Spring Branch Independent School District v. O.W.,* relied on section headings and context when interpreting the expedited evaluation requirements contained within these same provisions of the IDEA, and noted that the "expedited evaluation requirement is in a provision addressing procedures for discipline". 961 F.3d 781, 791-92 (5th Cir. 2020). The court wrote that the "expedited evaluation requirement only triggers when the child is subjected to disciplinary proceedings" and concluded "the IDEA's text and structure, including its implementing regulations, compel a conclusion that the child find and expedited evaluation requirements are separate and independent." *Id*. This is the correct analysis. The disciplinary provisions included in the IDEA (20 U.S.C. § 1415(k)), including the right to appeal decisions made pursuant to those disciplinary provisions (20 U.S.C. § 1415(k)(3)), should be read together. There is no indication in the text or structure of the IDEA that Congress intended otherwise. As a result, the District should not be permitted to utilize the disciplinary appeal provision in a context

where there was no disciplinary action.  The Student's IEP Team agreed in January 2020 that he should be returned to his classroom.  District administrators challenged this decision using the expedited due process disciplinary appeal proceedings even though, following the IEP Team decision, the Student was not subjected to generally applicable disciplinary procedures and no manifestation determination was held.  In this case, there was simply nothing to "appeal".

### B. Even if the District properly invoked the expedited due process appeal procedures to challenge the decision of its own IEP Team, simply filing an expedited hearing was not sufficient to change the Student's placement.

The IDEA requires that, during the pendency of any proceedings challenging a student's placement, unless the educational agency and the parents otherwise agree, "the child shall remain in the then-current educational placement." 20 U.S.C. §1415(j).  This provision is designed to preserve the status quo during a challenge to a proposed change in educational placement, and is generally referred to as the "stay put" provision. *Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 3 (1st Cir.1999).  The "preservation of the status quo ensures that the student remains in the last placement that the parents and the educational authority agreed to be appropriate." *Id.*, at 10.  In this case, there is no dispute that the last agreed upon educational placement was the placement determined by the January 2020 IEP Team. (R. vol 4 at 664.)("The District does not dispute that [the January 21, 2020 IEP Team determination] would normally be the Student's stay put placement, by virtue of the family's hearing request"); See also: (R. vol 1 at 104, 192, 202).  But rather than honoring the Student's stay put rights arising out of the IEP Team agreement, the District helped itself to an extralegal injunction.

In *Honig v. Doe*, the Supreme Court, interpreting the stay put provision under the IDEA, determined "Congress very much meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students,

from school". *Honig v. Doe*, 484 U.S. 305, 323-24 (1988).  The Court noted that Congress was

motivated by a finding that "school systems across the country had excluded one out of every

eight disabled students from classes." *Id.*, at 324.  The *Honig* Court stressed that protections under

the IDEA were reflective of "Congress' unquestioned desire to wrest from school officials their

former unilateral authority to determine the placement of emotionally disturbed children." *Id.*, at

321.  Over 30 years after *Honig*, the District argues that it retains unilateral authority to determine

the placement of children with disabilities and, based on this radical view of the IDEA, twice

issued itself its own injunction.  By filing an expedited hearing, then withdrawing it, then filing

again, before withdrawing it when the COVID-19 closures rendered it, in the District's view,

"unnecessary," the District unilaterally removed the Student from his last agreed upon educational

placement for approximately 36 school days.  The District's actions violated the IDEA and caused

educational harm to the Student.

     The District's assertion that it had the power to unilaterally change the Student's

placement to an interim alternative educational setting (IAES) is based on a misreading of the

following provision:

> **(4)Placement during appeals**
>> When an appeal under paragraph (3) has been requested by either the parent or the local educational agency—
>>
>> (A)the child shall remain in the interim alternative educational setting pending the decision of the hearing officer or until the expiration of the time period provided for in paragraph (1)(C), whichever occurs first, unless the parent and the State or local educational agency agree otherwise; and
>>
>> (B)the State or local educational agency shall arrange for an expedited hearing, which shall occur within 20 school days of the date the hearing is requested and shall result in a determination within 10 school days after the hearing.

20 U.S.C. § 1415(k)(4).  But based on the plain language of this provision, the requirement that a

student remain in an IAES during expedited proceedings ends when *either*: a) a hearing officer

order on the merits is issued (which would then govern); or b) "until the expiration of the time period provided for in paragraph (1)(C), whichever occurs first." *Id*.  The time period referenced in this provision is governed by "the relevant disciplinary procedures applicable to children without disabilities" which "may be applied to the child in the same manner and for the same duration in which the procedures would be applied to children without disabilities." 20 USC § 1415(k)(1)(C).  So, a student must remain in the IAES until *either*: a) the hearing officer issues an order (which must be within 30 school days of filing) or b) until the disciplinary removal, imposed through generally applicable discipline procedures, concludes, *whichever occurs first*.  The District largely ignores this aspect of the provision.  As did the Hearing Officer.  As discussed in detail above, expedited proceedings under the IDEA presume a disciplinary action, and 20 U.S.C. § 1415(k)(4) explicitly contemplates an underlying disciplinary removal, where the student with a disability is subjected to the same disciplinary procedures applicable to children without disabilities.  The District's use of this provision to challenge the placement decision of its own IEP Team, when the student had not been subjected to generally applicable disciplinary procedures, was improper.  And its assertion that simply filing the request was sufficient to change the Student's stay put placement was without legal basis.  The decision of the Hearing Officer to the contrary was in error.

It is also worth noting that the District did not even develop an interim alternative educational setting in accordance with the IDEA, which is clear that the IAES "shall be determined by the IEP Team." 20 U.S.C. § 1415(k)(2).  Here, the IEP Team agreed in January 2020 that the Student should be in his classroom, for a full day, with appropriate supports.  The January 2020 IEP Team did not discuss or determine an IAES because there was no reason to do so. Yet the District argues that its filing immediately "by force of law" relegated the Student to an

IAES pending the decision of the Hearing Officer (a decision which it twice thwarted by withdrawing the expedited proceedings). This is just another example of how the District seeks to benefit from the disciplinary provisions of the IDEA without complying with any of the procedural protections, such as the use of disciplinary procedures applicable to all students, conducting a manifestation determination, or ensuring the IAES is developed by the IEP Team.

In *Olu-Cole*, the D.C. Circuit provided an excellent overview of the nature and purpose of the disciplinary procedures in the IDEA. *Olu-Cole v. E.L. Haynes Public Charter School,* 930 F.3d 519, pp. 525-26 (D.C.Cir.2019). This case involved a student who had assaulted another student, resulting in a concussion, and forming the basis for a 45 day suspension. When his family sought a return to school, he was refused admission and the school initiated a hearing to extend his removal pursuant to the provision at issue here. Given the refusal of the school to allow the student to return, and its assertion of unilateral authority to continue the removal beyond 45 days, the student sought relief from the federal court. The D.C. Circuit held that the district court had erred by placing the burden of proof on the parent, writing:

> It also must be remembered that the <u>stay-put provision reflects Congress's considered judgment that children with disabilities are substantially harmed by and must be protected against school policies of unilateral disruption and exclusion</u>. That presumably is why the statutory stay-put scheme requires no additional showing of harm by the individual student. Any judicial decision to override that congressional judgment would be both "extraordinary and drastic," and should be withheld "unless the [school]" carries its heavy burden "by a clear showing" of irreparable harm. The district court's inversion—flipping that heavy burden to the parent—"dilute[d] th[at] statutory framework" and the robust procedural protections it extends to children with disabilities. That erroneous reordering of the burden of proof necessarily constitutes an abuse of discretion.

*Id.*, at 529. The court made clear "it is the school, not the parent that bears the heavy burden of securing preliminary relief" from the operation of the stay put. *Id*. at 527. But here, the District

maintains it can help itself to an automatic statutory injunction without any burden whatsoever beyond filling out a form to request a hearing.  This turns the IDEA on its head.

The district court decision in *Olu-Cole*, although reversed on other grounds, includes a detailed consideration, and rejection, of the District's argument in this case – that the simple act of filing an expedited proceeding grants it authority to unilaterally remove the Student based on the bare allegation that his return to the classroom would be substantially likely to result in injury. In rejecting the argument, the court wrote:

> Thus, upon expiration of the School's authority to remove pursuant to Section 300.530(g), the stay put provision governs until such time as the hearing officer issues a determination in the administrative hearing. Should the hearing officer order that the child be in an interim alternative educational setting, that determination would apply prospectively, and not function to ratify additional time already spent in an alternative education setting in excess of the 45 days permitted by Section 300.530(g).

*Olu–Cole v. E.L. Haynes Public Charter School*, 292 F.Supp.3d 413, 418-19 (D.D.C. 2018)[10]. The court made clear that the act of simply filing an expedited hearing request was not sufficient to automatically extend the student's removal from school.  Here. the District's claim of entitlement to unilateral authority Congress took away decades ago should similarly fail. The District was unhappy with the decision of its own IEP Team and, despite the fact that there was no violation of a student code of conduct and no application of generally applicable discipline procedures, it improperly filed, and then withdrew, two expedited due process hearings in an effort to keep the Student out of his classroom that succeeded despite the IDEA's protections prohibiting this conduct.  The District unlawfully prevented the Student from accessing the placement ordered by his IEP Team from January 30, 2020 until the schools closed to in person

---

[10] While this case was reversed on other grounds, as indicated above, the D.C. Circuit reviewing the case noted that "the district court correctly applied the operative provisions in Section 1415(k) and 34 C.F.R. § 300.533." *Olu-Cole v. E.L. Haynes Public Charter School,* 930 F.3d at 532, FN 1. (D.C.Cir.2019).

instruction due to COVID-19.  This improper unilateral removal violated the Student's rights

under the IDEA, resulting in additional educational harm.

### C. *The IDEA should not be interpreted in a way that would bring it into conflict with the Constitution or the Americans with Disabilities Act.*

The IDEA should not be interpreted in a way that would bring it into conflict with the U.S.

Constitution or the Americans with Disabilities Act.  The IDEA contains a rule of construction

provision which states:

> Nothing in this chapter shall be construed to restrict or limit the rights,
> procedures, and remedies available under the Constitution, the Americans with
> Disabilities Act of 1990 [42 U.S.C. 12101 et seq.], title V of the Rehabilitation
> Act of 1973 [29 U.S.C. 790 et seq.], or other Federal laws protecting the rights of
> children with disabilities…

20 U.S.C. § 1415(l).  While this provision is generally cited for the IDEA exhaustion requirement,

the direction that the IDEA shall not be construed to limit the rights available under the ADA and

the Constitution is an important one.  The Student brought claims under the ADA as well as

procedural due process claims at the administrative hearing, and the Hearing Officer declined to

exercise jurisdiction over those claims (R. vol. 1 at 52-53).  The Student included these related

claims in this action, although they have been set aside pending complete resolution of the IDEA

claims. (Document 14, Scheduling Order, 5/10/21).  Although these related claims will not be

resolved or fully briefed at this stage of these proceedings, it is important to consider the potential

implications of accepting the District's radical interpretation of the IDEA with regard to the

Student's rights under the ADA and the Constitution.

If the IDEA were interpreted to allow the District to act as it has in this case, it would raise

significant due process concerns.  Students facing disciplinary removals from school have

constitutionally protected interests requiring they be given due process. *Goss v. Lopez*, 419 U.S.

565, 577 (1975)(explaining that "[n]either the property interest in educational benefits

26

temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary"); *Gorman v. University of Rhode Island*, 837 F.2d 7, 12 (1ˢᵗ Cir. 1988)(stating that "a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process").[11]

Due process protections are required for all students, including students with disabilities. And as a recent court decision made clear, schools may not rely solely on processes based in the IDEA when removing students from school. *Patrick v. Success Academy Charter Schools,* 354 F.Supp.3d 185, 237-38 (E.D.N.Y.2018).  This case also involved a student who had been regularly suspended and a school that was taking extraordinary steps to continue excluding him from school, leading to due process and other challenges by the family. *Id*., at 196-99.  With regard to potential due process violations associated with these removals, the court found that the procedures afforded through the manifestation determination process and the IDEA are not sufficient, reasoning:

> the additional procedural protections afforded to AG under the IDEA do not satisfy constitutional due process requirements for suspensions in excess of 10 school days. "[Disabled] children have a constitutional right to procedural due process independent of the due process rights provided in the [IDEA]."  In other words, the MDR provisions of the IDEA do not satisfy the minimum requirements of due process. As noted above, the IDEA requires that an MDR hearing must be held within 10 school days of the alleged incident to determine whether or not the alleged conduct was a manifestation of the student's disability. The findings of the MDR are subject to appeal, and the State or local educational agency has 20 school days to hold an expedited hearing on the appeal and then another 10 school days within which to issue a decision. 20 U.S.C. § 1415(k)(4). As a result, the entire IDEA process can take up to 40 school days. Thus, while *Goss* entitles a non-disabled student who "poses a continuing danger to persons or

---

[11] In Maine, if a district wants to remove a student from school for more than 10 days, school board action is required. 20-A M.R.S.A. §1001(9)(permitting school boards to authorize the principal to suspend students up to a maximum of 10 days). Students facing removals of longer than 10 days are entitled to a hearing before the school board, including notice of the charges, access to records, the right to present and cross examine witnesses, and the right to bring an attorney. 20-A M.R.S.A. §1001(8-A).

> property or an ongoing threat of disrupting the academic process" to notice and a
> suspension hearing "as soon as practicable" after a suspension has been ordered,
> the IDEA, in effect, permits a decision to be rendered on AG's long-term
> suspensions as late as 40 school days after the suspensions are imposed, which
> cannot be deemed "as soon as practicable."

*Id.*, at 220 (internal case citations removed).  After reviewing additional case law in the area in

light of the requirement of the IDEA that schools must apply disciplinary procedures in the same

manner as would be applied to children without disabilities, the court concluded:

> The Court finds that, in light of the fact that AG's IEP team did not voluntarily
> consent to, or affirmatively propose or effect, a change in AG's placement during
> his February 24, 2017 suspension, Plaintiffs have sufficiently alleged a violation
> of the IDEA based on Defendants' failure to provide AG with a *Goss*-type
> hearing, discussed supra, as "would be applied to children without disabilities."
> 20 U.S.C. § 1415(k)(1)(C).

*Id.*, at 238.  Here, the Student was denied access to his classroom and the placement ordered and

agreed to by his IEP Team from January 30, 2020 through the date schools closed for in person

instruction due to COVID-19.  He did not receive notice of the charges against him or any

opportunity to be heard.  And he was denied access to the generally applicable disciplinary

procedures available to all students.  Although he was not formally suspended or expelled, the

effect was the same – he was prevented from setting foot inside his school.  The IDEA does not

provide special tools to remove students with disabilities.  And even if it did, students with

disabilities still retain their constitutional due process rights.

 The District's argument that the IDEA provides a tool for unilateral removal from school,

a tool to be used exclusively against students with disabilities, would also bring the IDEA into

conflict with statutes prohibiting disability discrimination, such as the Americans with Disabilities

Act.  Students with disabilities must not be treated less favorably than their non-disabled peers.

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §

12132.  The ADA regulations make clear that it is unlawful discrimination for a public entity to:

"Afford a qualified individual with a disability an opportunity to participate in or benefit from the

aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii).  By

subjecting the Student to a unilateral removal to a segregated placement by misusing procedures

only applicable to students with disabilities, and by denying him access to procedures applicable

to all students, the District discriminated against the Student in violation of the ADA.  It simply

cannot be that Congress, in its decades long effort to protect students with disabilities from

unilateral exclusion from school, handed school districts a tool that it could use *only* against

students with disabilities, to unilaterally impose removals from school without first providing

students with disabilities with the basic protections available to all students or invoking generally

applicable disciplinary procedures.

### III.   The District's February 2020 proposal of an unidentified and unavailable placement was a procedural violation of the IDEA.

Schools must provide clear, formal, and specific offers of placement as a way to support

meaningful parental involvement under the IDEA.  This is the prior written notice requirement.

20 U.S.C. § 1415(b)(3); 20 U.S.C. § 1415(c)(1).  In *Union Sch. Dist. v. Smith*, the Ninth Circuit

highlighted the importance of this notice requirement, finding:

> this formal requirement has an important purpose that is not merely technical, and
> we therefore believe it should be enforced rigorously. The requirement of a
> formal, written offer creates a clear record that will do much to eliminate
> troublesome factual disputes many years later about when placements were
> offered, what placements were offered, and what additional educational assistance
> was offered to supplement a placement, if any. Furthermore, a formal, specific
> offer from a school district will greatly assist parents in "present[ing] complaints
> with respect to any matter relating to the ... educational placement of the child.

15 F.3d 1519, at 1526 (9th Cir.1994). <u>See also</u>: *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1199 (9th Cir.2017)(holding the failure to identity the specific assistive technology services to be provided the student infringed on the parents' right to participate in the IEP process and denied the student a FAPE); *A.K. v. Alexandria City Sch. Bd.*, 484 F. 3d 672, 681 (4th Cir. 2007)("we hold as a matter of law that because it failed to identify a particular school, the IEP was not reasonably calculated to enable A.K. to receive educational benefits."); *Williams S. Hart Sch. Dist. v. Antillon*, 2021 WL 3086146, *4 (C.D.Cal. 2021)(holding that the "ALJ did not err in finding that the District's failure to present a clear written offer of a single school violated A.A.'s FAPE rights."); *Glendale Unified Sch. Dist. v. Almasi*, 122 F.Supp.2d 1093, 1107 (C.D.Cal. 2000)(holding that "[o]ffering a variety of placements puts an undue burden on a parent to eliminate potentially inappropriate placements, and makes it more difficult for a parent to decide whether to accept or challenge the school district's offer.")   In this case, the Hearing Officer found that it was appropriate for the District to propose a placement pursuant to the IDEA that was unspecific, unidentified, and unavailable. (R. at 47-50).  This aspect of the decision is contrary to the clear procedural requirements of the IDEA that are meant to ensure meaningful involvement of parents in decision-making.  The District's February 2020 proposal for an unavailable and unspecified "special purpose private school" fell well short of the requirements of the IDEA.

This is not the first time the issue of an unspecific day treatment proposal has come before a district court Maine. <u>See</u>: *Millay v. Surry Sch. Dept.,* 2009 WL 5184388, *16-17 (D.Me.2009); <u>order affirming the recommended decision</u>, *Millay v. Surry Sch. Dept.*, 707 F.Supp.2d 56, 65 (D.Me.2010).In *Millay v. Surry Sch. Dept.*, the school district held an IEP meeting to discuss two different day treatment programs that "did not include any proposed input

from these service providers let alone any data about staffing or space commitments for [the student's] proposed day treatment placement" and the resulting IEP specified "the location for special education services simply as 'day treatment program', without expressing commitment to either of the identified day treatment locations." *Millay v. Surry Sch. Dept.*, 2009 WL 5184388, *11 (D.Me.2009).  The court found that "this approach fell short of IDEA's requirements", reasoning that:

> It was incumbent upon Surry to produce substantive support for its placement decision so that Ms. Millay and the rest of the team could meaningfully understand whether Kids Peace or Stillwater Academy could implement the program and could understand what, if any, exposure to non-disabled students would be available to YRM. Unfortunately, this never occurred. Surry's day treatment placements did not conform to the IDEA's mandates…YRM should not lose out because of Ms. Millay's refusal to place her daughter on a day treatment trial balloon.

*Id.*, at *23-24.  Although the parents in that case had much more information about the proposed placement than the Student's Foster Parents here, the court still found that fell short of IDEA procedural requirements.  There was no representative from any proposed placement at the February 2020 IEP meeting.  And the District did not have anyone at the meeting with any specific knowledge about any potential placements.  In fact, the District proposed a placement in an unidentified "private special purpose behavioral program" knowing that no such placement was actually available.  As a result, rather than providing a meaningful opportunity for the Parent to participate in the development of the Student's IEP, this IEP meeting seemed to be nothing more than an attempt by the District to improve its litigation posture and obscure actual placement options.  The District's proposal was a private day treatment trial balloon, adrift and untethered, since no such placement was available for the IEP Team to consider. Yet the District proposed it anyway, in violation of the IDEA.

Currently in Maine, parental consent is not required before making material changes to a student's IEP.  Instead, special education regulations provide that: "[i]f the team cannot reach consensus, the SAU must provide the parent with prior written notice of the school's proposals or refusals, or both, regarding their child's educational program, and the parents have the right to seek resolution of any disagreements by initiating an impartial due process hearing or a complaint investigation." Maine Unified Special Education Regulation ("MUSER") 05-071, Chapter 101, §VI.2.I.  As a result, any school district that seeks to change the placement of a student with a disability may do so, even over the objection of the parent, by providing written notice 7 days in advance of the change. MUSER, Appendix , p.220.  If a family wants to stop the change from going into effect over their objections, they must, within that 7 day period, initiate a due process hearing, file a complaint, or get the school to agree to mediation.  As a result, following the February 2020 IEP Team proposal to place the student in an unidentified special purpose program, the parent was forced to either challenge the proposal or risk having it go into effect, which would have changed the Student's stay put placement to an unidentified program in an unidentified location.

The District clearly knew this, as evidenced by the issuance of the Written Notice on the same day as the meeting and because, 6 days later, it withdrew its first expedited hearing request, indicating there was no longer a reason for an expedited hearing." (R. at vol. 4, 580.)[12].  Despite the very real legal implications of the District's proposed placement in an unidentified private special purpose program, the Hearing Officer concluded that the Student's procedural claims

---

[12] The District wrote to the Hearing Officer after withdrawing its first expedited hearing: "The team decision at issue has since been superseded by a more recent team order" and continuing that "[t]he controversy may very well re-awaken if the family files for a hearing challenging the team decisions of February 14" (R. vol 4 at 582). See also: (R. vol 1, at 164)(indicating that because the February IEP team proposal "would go into effect on Friday, February 21, 2020 (during school vacation week), the need for the District's expedited proceeding at that point disappeared.").

related to this IEP meeting were premature and lacked merit because there was "no actual placement being offered" (R. vol. 1 at 49).  But the fact that no actual placement was offered is precisely the problem.  This aspect of the decision was in error.[13]

In addition to its failure to provide the parent with clear and specific information at the meeting, the District had predetermined the outcome, which was an additional impediment to meaningful parental participation.  In order to fulfill the requirement of parental participation in the process, schools must conduct not just an IEP meeting, but a *meaningful* IEP meeting. *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 857-58 (6th Cir.2004).  "Predetermination occurs when the state makes educational decisions too early in the planning process, in a way that deprives parents of a meaningful opportunity to fully participate as equal members of the IEP team." *R.L. v. Miami Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1188 (11th Cir. 2014).  Schools "cannot come to the meeting with closed minds, having already decided material aspects of the child's educational program without meaningful parental input." *Id*.  And to "avoid a finding of predetermination, there must be evidence the state has an open mind and might possibly be swayed by the parent's opinions and support for the IEP provisions they believe are necessary for their child…. those responses should be meaningful responses that make it clear that the state had an open mind about and actually considered the parents' points." *Id*.  Here, it was clear to the Foster Parent, and to Dr. Bartholomew who attended the meeting, that returning the Student to his classroom, even with additional services and supports, was not meaningfully considered.  And while the District did not even have an appropriate placement for the Parent to consider, it had clearly determined that the

---

[13] The Hearing Officer also found that the "District was prepared to offer viable options at which the program could be implemented."  There are two problems with this: 1) as discussed above, the parent was entitled to a discussion of these options at an IEP meeting and a clear proposal of placement; and 2) it is completely at odds with the factual record, because, as the District's special education director confirmed in her testimony, there was never a private special purpose program available to the Student. See: (R. vol 11 at 583-86.)

Student would be served somewhere, anywhere, other than his classroom.  The February IEP meeting fell well short of meeting the procedural requirements of the IDEA and the decision of the Hearing Officer to the contrary was in error.

## IV.   The Hearing Officer failed to order appropriate relief for the clear violations of the IDEA determined at hearing.

The Student prevailed on several issues below, but the Hearing Officer failed to order adequate relief with little to no discussion, and applied an outdated standard for calculating the relief that was ordered.  As a result, the Student requests, after this Court determines the scope of the additional IDEA violations on review here, that this matter be remanded to the Hearing Officer for an appropriate determination of the compensatory educational services necessary to put the Student in the place he would have been but for the District's significant substantive and procedural violations of the IDEA.

The IDEA requires that a "free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school." 20 U.S.C. §1412(a)(1)(A). And a FAPE must be provided in conformity with the student's individualized education program. 20 U.S.C. §1401(9)(D).  As the Supreme Court stated "the IEP is the centerpiece of the statute's education delivery system." *Endrew F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017).  In a due process hearing filed pursuant to the IDEA, two types of arguments are available to families.  They can make substantive arguments regarding the denial of a FAPE. 20 U.S.C. § 1415(f)(3)(E)(i).  Or they can raise procedural violations that lead to a denial of a FAPE because they either: a) impeded the right to a FAPE; b) significantly impeded the ability of the parents to participate in the IEP Team process; or c) caused a deprivation of educational benefits. § 1415(f)(3)(E)(ii); *Pollack v. RSU 75*, 886 F.3d 75, 80 (1ˢᵗ Cir.2018). See also: *M.C. v. Antelope*

*Valley Union High Sch. Dist.*, 858 F.3d 1189, 1195 (9th Cir.2017)("compliance with the IDEA's procedural safeguards is essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important [and p]rocedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA.")(internal citations and quotations removed).  In this case, the Student alleged, and the Hearing Officer found, that the District violated both the substantive requirements of the IDEA (by materially failing to provide the services required on his IEP and failing to provide appropriate and timely behavior interventions and supports), and significant procedural violations (related to the District's quest to prevent the Student from accessing his classroom from October 2019 through the closure of schools in March 2020).

Due to these violations, the Student was entitled to relief.  However, as discussed below, the relief ordered by the Hearing Officer was inadequate to put the Student in the place he would have been but for the District's substantive and procedural violations of the IDEA.  Compensatory education is available to remedy past deprivations of access to a FAPE under the IDEA.  *Pihl v. Mass. DOE*, 9 F.3d 184, 189 (1st Cir.1993). See also: *Mr. I. ex rel. L.I. v. Maine School Admin. Dist. No. 55*, 480 F.3d 1, 25 (1st Cir.2007)( "We have recognized that, as another form of 'appropriate relief' available under §1415(i)(2)(C)(iii), a court may require 'compensatory education' in the form of 'further services, in compensation for past deprivations' of IDEA benefits.").  Compensatory education should be designed to "place disabled children in the same position they would have occupied but for the school district's violations of the IDEA." *Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005).

Once IDEA violations resulting in a denial of FAPE are proven and found, the family has done their part.  In *Maine Sch. Administrative Dist. No. 35 v. Mr. R*, the court wrote:

> In mounting a challenge to a current or proposed IEP, the most that parents can be expected to do is to point out areas in which the IEP is deficient. *See Rowley*, 458 U.S. at 208–09, 102 S.Ct. 3034; *Erickson*, 199 F.3d at 1123; *Roland M.*, 910 F.2d at 992. These tenets hold true vis-à-vis claims for compensatory education. *See Cent. Reg'l Sch. Dist.*, 81 F.3d at 397 (noting that "a child's entitlement to special education should not depend upon the vigilance of the parents"). The appellants, who pointed to many problems in both the 1999–2000 IEP and the proposed 2000–2001 IEP, did their part. Consequently, we reject the School District's suggestion that the appellants' compensatory education claim was insufficiently precise.

321 F. 3d 9, 20 (1st Cir. 2003).  And if the record is insufficient to permit a reviewing court to "make the highly nuanced judgments necessary to resolve the claim for compensatory education, it may remand the matter for further administrative adjudication." *Id*.  In some circumstances, this will require a hearing officer to order additional evaluations to craft an appropriate compensatory remedy.  IDEA hearing officers are empowered by the IDEA to order independent educational evaluations as part of a due process hearing. 34 CFR § 300.502. See also: *Luo v. Roberts*, 2016 WL 6831122, *7 (E.D.Pa. 2016)("a Hearing Officer is permitted, and in some cases required, to order an independent educational evaluation at public expense"); *Lyons v. Lower Merrion Sch. Dist.*, 2010 WL 8913276, *2 (E.D.Pa. 2010)(Although 34 C.F.R. § 300.502(d) allows a hearing officer to order an IEE "as part of" a larger process, it does not prohibit a complaint brought to obtain only an IEE.").  A recent district court decision outlines the task of the IDEA hearing officer in these situations in detail:

> Accordingly, on remand, the Hearing Officer must invite Plaintiff to submit additional evidence and/or order the necessary assessments to help him to fashion an award of compensatory education. The Hearing Officer should be guided by the principle that, "[t]o fully compensate a student, the award must seek not only to undo the FAPE denial's affirmative harm, but also to compensate for lost progress that the student would have made." That inquiry requires "figuring out both [(1)] what position a student would be in absent a FAPE denial and [(2)] how to get the student to that position." To answer the latter question, the Hearing Officer will need to first ascertain the student's needs at the time of the award, for absent a baseline from which to proceed, developing a program to make the student whole will be elusive. Current assessments of the student can be a critical

> tool in answering these foundational questions. The Hearing Officer shall order
> such assessments, as necessary, to aid his efforts.

*Butler v. District of Columbia*, 275 F.Supp.3d 1, 6-7 (D.D.C. 2017)(internal citations omitted).

The Student seeks a similar process here because the Hearing Officer failed to provide any relief

for some of the IDEA violations found, without explanation or discussion.

The Hearing Officer found the District failed to deliver the related services contained

within the Student's IEP, including social work services, speech and language services and

occupational therapy services. (R. vol. 1 at 39.)  And the Hearing Officer found these failures to

provide the related services in the Student's IEP "were material omissions from the Student's

programming and resulted in the denial of the FAPE. (R. vol. 1 at 52.)  But without discussion or

justification, the Hearing Officer simply ordered the District to provide the hours of speech,

social work, and occupational therapy that the Student was entitled to but did not receive.  This

ignored the impacts of these missed services and deprived the Student of the individualized

assessment of the impacts of the District's failure to provide these services that the IDEA

requires.  The Hearing Officer seemed to consider the failure to provide these related services in

isolation, ignoring the importance of these services to the Student, and the broader impacts of the

failure to provide them.[14]  For example, as Dr. Bartholomew testified at hearing, these related

---

[14] See: (R. vol. 9 at 27) (Parent explaining that occupational therapy is very important for the Student, especially work with the Zones of Regulation); (R. vol. 9 at 139) (Independent Evaluator discussing the importance of occupational therapy services for the Student); (R. vol. 9 at 26) (Parent explaining that speech services are very important for him because difficulties with pragmatic language are a large part of his social struggles); (R. vol. 9 at 139) (Independent Evaluator indicating that speech and language services are very important for the Student because "one of [the Student]'s deficits is being able to communicate his needs, his frustrations in an appropriate way"); (R. vol. 9 at 140) (Independent Evaluator discussing the importance of social work services in light of the Student's trauma history); (R. vol. 10 at 226) (Therapist discussing the importance of speech services, occupational therapy, and social work to the Student.); (R. vol. 10 at 454) (School Psychologist/FBA Evaluator stating "yes, social work services at the very beginning targeted for [the Student] would have made a difference.")

services providers should have been part of debriefing and planning after any major behavioral incident to develop a plan to prevent it from happening again. (R. vol 9 at 148-49).  The Hearing Officer failed to discuss or consider the full impact of the District's failure to provide the services required by the Student's IEP.

In addition, the Hearing Officer found that the District failed to provide "the proper behavior interventions and supports the Student needed in order to remain safe and keep others safe" and that "the failure to consult with a [Board Certified Behavior Analyst] and use appropriate behavior interventions was a violation of the Student's [Individualized Education Program]." (R. vol. 1 at 37-38).  Specifically, the Hearing Officer found that a "BCBA was needed early in the Student's transition to the District in order to help refine behavior interventions, which may have reduced the level of the Student's aggressive behaviors." (Id. at 37.)  And the Hearing Officer found the "result of not seeking advice from a BCBA more likely than not resulted in the Student's continuing assaultive and threatening behaviors". (Id. at 38.) The Hearing Officer noted that once the District accessed the services of a BCBA to draft a new behavior plan and reentry plan which the parents and District believed would work. (Id. at 38). In fact, this plan was implemented successfully in September 2020. (Compl. ¶ 80; Answer, ¶ 80.) Despite these findings which make clear that the Student's removals were, at least in part, due to the District's failure to provide the BCBA consultation services required in the IEP, the *only* relief the Hearing Officer ordered for this violation was 9 hours of BCBA consultation services "on an hour for hour basis". (Id., at 54).  The relief awarded fails to account for the impact of the Student's repeated exclusions from the classroom prior to the unilateral October removal to tutoring, and fails to account for the subsequent harms that resulted from the Student being segregated from peers and denied access to special education services in a segregated tutoring

placement from October through the date the schools closed due to COVID-19.  This was in error, especially in light of the clear evidence at hearing that even the District knew that segregated tutoring was not appropriate.[15]

Finally, the Hearing Officer found that the District's unilateral placement of the Student in a segregated tutoring placement for behaviors that were manifestations of his disabilities was a violation of the IDEA.  Specifically, the Hearing Officer found that the District, in October 2019, "unilaterally chose to remove the Student from the SMES behavior program and place him in tutoring while an out-of-district placement could be found. (R. vol. 1 at 42.).  As a result of this removal, which the Hearing Officer correctly found was improper, the Student was in a segregated tutorial placement for months.  While in this segregated placement, he did not receive special education services and his tutor had not even seen his behavior plan.  Although the

---

[15] In fact, at an IEP meeting on May 10, 2019, the Student's previous District had explicitly rejected tutoring because the Student "needs to participate in learning with peers in order to access FAPE in the least restrictive environment for him." (R. vol. 5 at 844.) *See also* (R. vol 10 at 372-73) (Teacher describing tutoring as an "interim" placement and describing it as a plan "to provide him enough of an academic background to keep him where he needed to be but it was not – no one agreed it was the perfect placement or the most appropriate.  It was just appropriate academically for a short period of time"); (R. vol. 11 at 538) (Special Education Director saying "I don't think there is an educator that would say tutoring is a replacement for . . . a regular setting for him of course"); (R. vol. 11 at 587) (Special Education Director saying "Of course it's an interim because we don't want tutoring to be this long-term placement for any child.  It's not the preferred of course"); (R. vol. 11 at 592) (Special Education Director saying "I don't think there's anybody who could straight-face argue as an educator that tutoring is the best placement for any child for a great length of time.  It's not preferred"); (R. vol. 11 at 598-99) (Special Education Director saying "this tutoring thing was just not something I wanted to have continue for any length of time and I was just cognizant – it's like having a patient who needs, you know, emergency care kind of a thing and you're just waiting for the doctor"); (R. vol. 9 at 49-50) (Parent stating the Student wasn't able to work on any of his social goals, and he was not being held accountable or required to do anything); (R. vol. 9 at 81) (Parent describing impacts of segregated placement); (R. vol. 9 at 86) (Parent describing the need for the Student to be around other students with appropriate supports); (R. vol. 9, 164-65) (Independent Evaluator discussing that teaching social skills in isolation does not support generalization of those skills); (R. vol. 10 at 222-25) (Therapist describing how the Student was upset and did not know how to earn trust back to return to his classroom, describing how he "was attributing that negatively to himself and feeling bad about it," and also describing how it was difficult to work on social skills when he was not with any peers; the Student also described himself as "I'm not part of the school"); (R. at vol. 11, 600-01) (Special Education Director recognizing that you could not target the Student's goals regarding peer interactions without access to peers.)

Student was harmed by this placement, the only relief the Hearing Officer ordered related to this significant IDEA violation was an order that District staff receive training in the "rules and regulations regarding discipline". (R. vol. 1 at 39.)   Even though the Student was removed from his classroom for months following this improper removal, and even though the tutoring program was clearly inappropriate as identified above, the Hearing Officer did not discuss or justify the failure to provide the Student with *any* relief.  This was in error.

The Student requests that the Court remand this matter back to the hearing officer to determine an appropriate remedy for the violations already determined and for the additional violations this Court may determine.  And in doing so, the Student requests that the Hearing Officer be directed to utilize the authority granted under the IDEA to order an independent educational evaluation and/or other necessary assessments to assist the Hearing Officer in determining an appropriate remedy.

**CONCLUSION**

For these reasons, we respectfully request that this Court: reject the District's Counterclaim; reverse the IDEA administrative decision as outlined above; and remand the matter back to the Hearing Officer to determine an appropriate remedy.

Dated: <u>September 13, 2021</u>　　　　　　　　　　/s/ Atlee M. Reilly

　　　　　　　　　　　　　　　　　　　　　Atlee M. Reilly, Maine Bar #5159
　　　　　　　　　　　　　　　　　　　　　areilly@drme.org
　　　　　　　　　　　　　　　　　　　　　Benjamin Y. Jones, Maine Bar #5240
　　　　　　　　　　　　　　　　　　　　　bjones@drme.org
　　　　　　　　　　　　　　　　　　　　　**DISABILITY RIGHTS MAINE**
　　　　　　　　　　　　　　　　　　　　　160 Capitol Street, Suite 4
　　　　　　　　　　　　　　　　　　　　　Augusta, ME 04330
　　　　　　　　　　　　　　　　　　　　　207.626.2774 ext. 220
　　　　　　　　　　　　　　　　　　　　　207.621.1419 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2021, I electronically filed this Memorandum of Law with the Clerk of the Court using the CM/ECF system, which will send notification to all involved parties in the case.

/s/ Benjamin Y. Jones

Benjamin Y. Jones, Maine Bar #5240
bjones@drme.org
**DISABILITY RIGHTS MAINE**
160 Capitol Street, Suite 4
Augusta, ME 04330
207.626.2774 ext. 220
207.621.1419 (fax)