UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| K.C., *foster parent and educational surrogate for M.D.*, and | ) ) ) | |
| MAINE DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 2:21-cv-00046-LEW |
| REGIONAL SCHOOL UNIT 73, | ) ) ) | |
| Defendant. | ) | |

**ORDER ON MOTIONS FOR JUDGMENT
ON ADMINISTRATIVE RECORD**

K.C., a foster parent, and the Maine Department of Health and Human Services join as Plaintiffs in this action against Defendant Regional School Unit 73, the Spruce Mountain School District, which serves the communities of Jay, Livermore, and Livermore Falls. Plaintiffs request, inter alia, judicial review of a state hearing officer's decision and order following a due process hearing conducted under the auspices of Maine special education law, 20-A M.R.S. Ch. 303, and the federal Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*. Through its counterclaim, Defendant also requests judicial review of the hearing officer's decision and order.

The matter is before the Court on briefs requesting a ruling on the IDEA portion of the case. Following oral argument, and for reasons that follow, the administrative decision is vacated in part and remanded for further proceedings.

## BACKGROUND

The hearing officer's decision and order concerns the 2019-2020 school year, and more narrowly the period between September 12, 2019, and March 15, 2020, after which RSU 73 disbanded live classes due to the COVID-19 pandemic. The decision and order relates to the rights of MLD, a "state agency client" who resides with foster parents. MLD was in fifth grade during the 2019-2020 school year, and was eleven years of age when the hearing officer issued her decision and order on November 8, 2020.[1]

Beginning in kindergarten, special education providers qualified MLD for special education services based on severe articulation impairment, with a provisional diagnosis of Attention Deficit Hyperactivity Disorder (ADHD). In time, MLD's qualification changed into the "Multiple Disabilities" category, which disabilities include Autism Spectrum Disorder (ASD), Adjustment Disorder, and Anxiety. Among the behavioral challenges MLD presents for educators, due to his disabilities and life experiences, are aggressive outbursts. In kindergarten and first grade, these behaviors involved hitting, punching, biting, and stabbing with pencils, sometimes resulting in the imposition of restraints in the school setting. In part because of these behaviors, following an extended hospital admission during his first-grade year (October 2015–January 2016), MLD entered a day treatment program instead of returning to a traditional school setting. There he remained until November 2018 (his fourth-grade year).

During his time in the day treatment program, MLD's IEP focused heavily on

---

[1] MLD's status as an agency client began in November 2018 (early in his fourth-grade year), when he was removed from the custody of his biological parents.

behavioral programming. His behavioral challenges (characterized by emotional dysregulation, physical aggression, and environmental destruction) were severe enough to keep him out of mainstream programming. MLD generally fell short of goals set for him on the academic side of his IEPs, though an April 2018 psychological evaluation demonstrated an overall average IQ.

MLD's participation in the day treatment program ended in November 2018, shortly after the beginning of his fourth grade year. At that time, MLD was removed from his family home, placed with temporary foster parents in South Paris, Maine, and enrolled in a self-contained program at RSU 17's Paris Elementary School.  Not long thereafter, MLD was twice hospitalized following behavioral outbursts. In February 2019, MLD entered Calais Regional Hospital, where he remained until May 2019.[2]

In May 2019, the Department of Health and Human Services placed MLD with a new therapeutic foster care family in Chesterville, Maine. The new foster parents enrolled MLD in a local RSU 9 school, which MLD attended for three hours per day.  This was MLD's third school placement during the fourth-grade year. Although MLD attended school in RSU 9 for only a brief time, the district was able to produce an individualized education plan ("IEP") for MLD. The IEP called for educational services to be provided in a day treatment setting. The IEP was adjusted during the summer of 2019, with attorney involvement, resulting in certain service enhancements but no change in the proposed day treatment placement. However, MLD's foster parents moved with him to Jay, Maine, and

---

[2] This summary understates MLD's experience significantly. Between November 2018 and April 2019, MLD experienced a total of seven "living and guardian transitions … and multiple hospitalizations." R. 849 (Vol. V).

by September 12, MLD was beginning fifth grade in Defendant RSU 73 (hereafter the "District" or "Defendant") at its Stone Mountain Elementary School ("SMES").

On September 20, 2019, MLD had his first outburst involving destructive behavior at SMES. No discipline was imposed on MLD for this incident. Then, on September 24, MLD had another outburst in which he kicked, punched, and spit on staff members, and threatened to bring a knife to school to kill them. During this incident, MLD kicked three staff members in the head. The District suspended MLD for three days.

Following the September 24 incident, MLD's new IEP Team convened and reached a consensus that MLD should be in a self-contained behavior program for four and a half hours each day. The IEP Team also established a schedule for the delivery of certain services and refined certain academic goals. The hearing officer described the resulting IEP as providing "extensive academic and behavioral goals, 30 minutes of speech therapy, 30 minutes of occupational therapy, 30 minutes of social work services, and BCBA consultation services 'as needed,'" as well as participation with non-disabled peers during 19% of his school day and other programming and support measures. Decision and Order at 12, ¶ 39 (R. 12 – Vol. I).

On October 1, 2019, MLD had an episode of aggressive behavior while in a shared special education classroom. Staff removed other students from the classroom, leaving MLD with a solitary staff member. MLD spit on this staff member and punched her repeatedly with a closed fist, resulting in several bruises to her legs. When the school resource officer arrived, MLD punched him in the face. During subsequent isolation in a room, MLD tore the door handle free and threw it against the door window glass. The

District suspended MLD for seven days.

On October 23, 2019, MLD became frustrated with academic work, threw his book, and started to antagonize other students, leading staff to remove the students from the room. MLD, alone with one staff member, escalated his behavior by throwing other objects, including scissors. He eventually punched the staff member once in the jaw and once on the temple and broke the glass in the classroom window. The District suspended MLD for four days.

At an October 29, 2019 IEP team meeting, the IEP Team agreed that MLD's disruptive behaviors were a "manifestation of the disability," a finding particular to the IDEA's procedural safeguards, discussed in more detail below. The IEP Team also concluded that MLD would thenceforth need to be educated in a 1:1 setting (also described as a "tutored" program) for six hours per day, four days per week, inside the school setting but outside the SMES behavioral program. Decision and Order at 15, ¶ 49. The IEP Team also decided that they would attempt to identify a suitable out-of-district placement. During this meeting, members of the IEP Team noted that SMES did not have the staff needed to support MLD's receipt of a 1:1 tutored program. MLD's foster parent signed a seven-day waiver form authorizing the immediate removal of MLD from the behavior program setting.

On December 9, 2019, MLD had another behavioral incident while present in a shared classroom. This incident involved a threatening display of scissors, verbal threats to kill a member of staff, and a variety of other acting-out behaviors. Other students were visibly frightened and crying. On this occasion, the District imposed a one-day suspension.

Also at this point, the District's director of special education directed that MLD's tutored program would be removed from the SMES setting and relocated to the District's central office, over the foster parents' objection.

The IEP Team did not convene to address MLD's removal from the SMES setting until January 21, 2020. In the interim, the District engaged a psychological services provider to perform a functional behavioral assessment, which the IEP Team considered at the January 21 meeting. At the meeting, the IEP Team issued a revised IEP acceding to the foster parents' desire to have MLD not only return to the SMES setting but also receive his IEP through its behavior program rather than in an isolated room. The IEP Team scheduled this change to take place on January 30.

The District's special education director, principal, and superintendent, however, all disagreed with the IEP Team's decision to return MLD to the behavioral program setting. On January 29, they appealed the decision by filing a request for an expedited due process hearing. In the request they sought an order for an "interim alternative educational setting of continued tutoring with related services." R. 1153 (Vol. VI). In response, on February 6, 2020, the foster parents filed a cross-request for a due process hearing seeking immediate enforcement of the January 21 IEP that called for MLD's return to the SMES behavior program.

At a team meeting on February 14, the IEP Team decided to modify its placement decision so that MLD would not return to the behavior program at SMES and would instead remain in the central office setting. In the District's view, this about-face by the IEP Team mooted the District's request for an expedited hearing, which the District promptly

withdrew. However, the foster parents' request for a due process hearing went forward. On February 20, 2020, the foster parents also refiled their hearing request to challenge the February 14 determination about placement, arguing that the stay-put placement called for by the IDEA's procedural safeguards was the behavioral program placement decided upon at the January 21 meeting. In light of this contention, the District filed a new request for an expedited hearing in which it argued that a return to the behavior program would risk substantial injury to MLD and others. The District acknowledged that it employed this tactic specifically to prevent application of the IDEA's default stay-put safeguard so that MLD would remain in the central office setting pending review by a hearing officer on an expedited basis. R. 317 (Vol. II).[3]

On March 15, 2020, the District closed its schools due to the COVID-19 pandemic. That development closes out the background chronology of events.[4]

### STANDARD OF REVIEW

"District courts considering challenges to administrative IDEA decisions apply an intermediate standard of review." *Johnson v. Bos. Pub. Sch.*, 906 F.3d 182, 190–91 (1st Cir. 2018). With this standard, the court is expected to make "an independent ruling based on the preponderance of the evidence," while also giving "due weight to the hearing

---

[3] *See also* Def.'s Mem. at 13 (ECF No. 19) ("The Parents' hearing request gave rise to stay put and required the Student's return to the SMES placement proposed at the January 21 team meeting, so the District then filed for an expedited due process hearing ….").

[4] By May 2020, with the contributions of other behavioral specialists, the District's IEP Team agreed to have MLD return to the school setting for the 2020-21 school year (this time in the new setting of the Stone Mountain Middle School). However, in October 2020, the Department changed MLD's foster placement once more, removing him from RSU 73 to a new foster family in another school district.

officer's findings." *Id.*

The IDEA instructs a court to "receive the records of the administrative proceedings[,] hear additional evidence at the request of a party[,] and[,] basing its decision on the preponderance of the evidence, . . . grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).[5] In the event that the court disagrees with the administrative decision maker, the court can fashion appropriate relief on its own; but if the process of determining the appropriate relief depends on more nuanced judgments, educational expertise, or other factors that are not readily susceptible to resolution based on the paper record or the parties' entreaties to provide supplemental offerings, then vacatur of the administrative decision, in whole or in part, and remand for further proceedings is appropriate. *Mr. C v. Maine Sch. Admin. Dist. No. 6*, No. 2:06-cv-198-DBH, 2007 WL 4206166, at *30 (D. Me. Nov. 28, 2007), report and recommendation adopted, 538 F. Supp. 2d 298 (D. Me. 2008) (collecting cases).

## DISCUSSION

In their Complaint, foster parent KC and the Department of Health and Human Services (hereafter, "Plaintiffs") allege that the District's unilateral change of MLD's placement to the central office setting and subsequent use of expedited hearing requests to keep him there pending due process review violated the IDEA. Plaintiffs also contend that the February 14, 2020 IEP team meeting violated the rights of MLD and his foster parents

---

[5] Supplementation of the administrative record is allowed more freely in IDEA cases than in typical cases involving judicial review of administrative proceedings. *Johnson v. Bos. Pub. Sch.*, 906 F.3d 182, 190-91 (1st Cir. 2018). However, in this proceeding, neither party has sought to supplement the administrative record. I therefore review the hearing officer's decision and order based on the same record the hearing officer considered.

because an out-of-district placement was proposed even though it was not then available. Finally, Plaintiffs claim that, although the hearing officer found that the school district failed to deliver MLD a free appropriate public education, the hearing officer did not award MLD adequate compensatory education services. Complaint ¶¶ 1-4, 24-27, 98-102.

In its Counterclaim, RSU 73 ("Defendant") requests a limited correction of the administrative decision, asking that I overturn only the hearing officer's finding that the foster parents did not agree to change MLD's placement at the October 29, 2019 IEP team meeting. Counterclaim ¶¶ 2, 26-29. I begin with the District's more pin-pointed challenge.

## A. The District's Counterclaim

The IDEA dictates that when a child engages in conduct in the school setting that would be deserving of discipline if the child were not disabled, the local educational agency's ability to change the child's educational placement is primarily a function of whether the child's conduct "was a manifestation of the child's disability." 20 U.S.C. § 1415(k)(1)(A)-(H).[6] If the conduct was a manifestation of disability, then a change of educational placement is not authorized and the agency must "return the child to the placement from which the child was removed, unless the parent and the local educational agency agree to a change of placement as part of the modification of the behavioral intervention plan." *Id.* § 1415(k)(1)(F)(iii).

At its October 29 team meeting, the IEP Team determined that MLD's disruptive

---

[6] This requirement is one of many "procedural safeguards" imposed on state and local educational agencies that accept federal financial assistance under Title 20, Chapter 33, Subchapter II ("Assistance for Education of All Children with Disabilities"). *See* 20 U.S.C. Ch. 33, Subch. II & § 1415(a).

behavior was a manifestation of his disability. It also determined, however, that MLD's placement would change to another room at SMES where he would be taught by a tutor on a 1-to-1 basis. During the team meeting, the foster parents expressed their agreement to this change. The hearing officer discussed this controversy as "issue 3" in her decision and order.

> ISSUE 3: Whether the District changed the Student's placement … to an inappropriate and isolated tutoring placement without providing the procedural safeguards (manifestation determination and prior written notice) required by the IDEA.

R. 39. As indicated in the hearing officer's characterization of the issue, because the occurrence of a manifestation determination was clear from the record, and because the foster parents expressed consent, this issue boiled down to the adequacy of the notice the District provided to the foster parents concerning their right to withhold consent.

However, although the hearing officer framed the notice issue as whether the District changed the student's placement without providing procedural safeguards, R. 39, her discussion focused on whether the foster parents in fact knew they could achieve the placement they preferred by withholding their agreement to the proposed change of placement. R. 39-42. By refocusing the inquiry in this way, the hearing officer found in favor of the foster parents because the foster parents testified that they did not appreciate their ability to counter the IEP Team's decision and because the District's employees on the IEP Team did not orally advise the foster parents that they could withhold agreement

and thereby require the District to return MLD to the behavior program. R. 40-42.[7]

The process by which the hearing officer determined the issue went as follows. Because the IDEA required a return to the existing placement based on the IEP Team's manifestation determination—absent the parents' agreement to a change of placement—the hearing officer reasoned that the parents could not have agreed to a change of placement unless they were orally informed at the team meeting that they had the right to refuse the change and thereby require MLD's return to the existing placement. R. 41 ("The District had an obligation to give the Foster Parents the proper information about the result of the manifestation determination in order to properly participate in the discussion."). In fact, the IDEA contains no such requirement. By creating this false premise, the hearing officer framed the issue in a manner that allowed only one conclusion about the existence of agreement. That conclusion was in error.

The record reflects that the foster parents received accurate and timely information on this issue in writing. R. 951 (Written Notice, noting: "Mr. and Mrs. D[] were given procedural safeguards at the meeting."), 956 (Special Education Manifestation Determination Checklist form) (Vol. V). Furthermore, the fact that none of the non-parent members of the IEP Team orally advised the foster parents that they could force MLD's return to the behavior program does not mean that the foster parents could not have agreed that the resulting placement was a more appropriate interim placement for MLD than a

---

[7] In her statement of the issue, the hearing officer also appeared to pose the question whether the placement was "inappropriate and isolated," but she did not address that question given her finding that the process behind the placement was deficient.

return to the behavior program. The hearing officer clearly understood this, insofar as she observed that the foster parents "may not have gone along" if they had been orally advised of the ability to direct the outcome. R. 41. More concerning, however, by making her finding in this way, the hearing officer negated the fact that the foster parents had communicated their assent to the IEP Team and conceded doing so. R. 41 ("The Foster Parents argue that despite their agreement …."); R. 954 (executed Seven Day Waiver form); 956 (signed Special Education Manifestation Determination Checklist form).

Because the foster parents received written notice of their right to have MLD return to the existing placement absent their agreement to the contrary, and because they agreed to the changed placement, I agree with Defendant that the hearing officer erred in superimposing on these particular team proceedings what in effect amounts to a mandatory, oral informed consent process that is not dictated by any IDEA or Maine special education law cited in Plaintiffs' memoranda.

Where, as here, a school agency supplies in writing the information that the foster parents contend they lacked and conducts a manifestation-related IEP team meeting that results in a change of placement, and where the record also reveals that the parents agreed to the change of placement, there is no cause to find fault with the school agency based on a supposed failure to satisfy an enhanced, oral informed consent standard. The District's request that the Court "reject the hearing officer's determination on this issue," Counterclaim Pl.'s Mem. 39 (ECF No. 19), is granted.[8]

---

[8] It is understandable that parents may be disappointed by a manifestation decision if the school agency does not advocate an outcome that enhances or modifies services to maintain an existing placement in a non-isolated educational setting. However, parents in this scenario should withhold agreement when they
*(continued next page)*

## B. Plaintiffs' Complaint

The challenges raised by Plaintiffs involve: (1) the District's use of two expedited due process requests to control MLD's placement following the January 2020 team meeting and following Plaintiff's February 2020 request for a due process hearing; (2) the District's February 2020 proposal concerning an out-of-district placement; and (3) the adequacy of the hearing officer's award of compensatory education services. I take each issue in turn.

### *1. Use of expedited due process appeals to control placement*

Plaintiffs argue that the District's first request for an expedited due process hearing unlawfully overrode the IEP Team's January 2020 decision to return MLD to the SMES behavior program, and that the District's second request for an expedited hearing unlawfully overrode the IDEA's default stay-put safeguard, which safeguard required that MLD remain in the behavior program pending the hearing officer's review of the foster parents' request for a hearing. Before considering their arguments, I return to the IDEA's relevant procedural safeguards to describe them in greater depth.

Section 1415 of the IDEA prescribes a collection of "procedural safeguards" to ensure that children with disabilities and their parents are able to participate in and help ensure the development and provision of a free appropriate public education. 20 U.S.C. § 1415; *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007).

---

believe the placement decision is not the appropriate decision. If they do so the statutory requirement of a return to placement will be triggered and the school agency presumably will do what the law requires it to do in that eventuality. But agreeing to a change at a team meeting, then litigating the issue months later, all to achieve a hearing officer's application of ad hoc informed-consent rule is not likely to produce better or more predictable procedural or educational outcomes.

Subparagraph (k) of the procedural safeguards, innocuously titled "[p]lacement in alternative educational setting," establishes safeguards for situations in which a child with an IEP engages in behavior that "violates a code of student conduct." 20 U.S.C. § 1415(k)(1)(A).

Subparagraph (k) begins with reassurances to local school agencies that "school personnel may consider any unique circumstances on a case-by-case basis when determining whether to order a change in placement." *Id.* Subparagraph (k) further establishes that school personnel have the baseline authority to remove a child from the child's IEP-designated placement "to an appropriate interim alternative educational setting" (hereafter, "IAES"), "for not more than 10 school days" when the child "violates a code of student conduct." *Id.* § 1415(k)(1)(B). Moreover, in certain "special circumstances," including a situation in which the student "carries or possesses a weapon … at school," school personnel may remove the child to an IAES for as many as 45 school days. *Id.* § 1415(k)(1)(G). The existence or non-existence of special circumstances is therefore of major significance in terms of the potential duration of a child's removal to an IAES.

In the absence of special circumstances the default time limit placed on an IAES imposed for violation of a conduct rule is 10 school days, in which time the child's IEP Team must "review all relevant information in the student's file" to determine whether the disruptive conduct was a manifestation either of the child's disability or of the school district's failure to implement the IEP. *Id.* § 1415(k)(1)(E). If the answer is yes, then certain additional safeguards are triggered; notably, a behavioral plan must be considered or an

existing behavioral plan revisited by the IEP Team and the student must be returned to "the placement from which the [student] was removed, unless the parent and the local educational agency agree to a change of placement as part of the modification of the behavioral intervention plan." *Id.* § 1415(k)(1)(F). But if the answer is no, meaning the conduct was not a manifestation, then the disruption of the child's ordinary programming for disciplinary purposes is a function of "the relevant disciplinary procedures applicable to children without disabilities," which may exceed 10 days. *Id.* § 1415(k)(1)(C).

However, if subparagraph (k)(1)(G) "special circumstances" exist, then the manifestation determination process, while still necessary, does not dictate the duration of an IAES imposed for conduct in violation of a code of student conduct. *See id.* § 1415(k)(1)(D) (indicating that a child may be removed from a current placement under subparagraph (G) "irrespective of whether the behavior is determined to be a manifestation of the child's disability") & § 1415(k)(1)(F)(iii) (indicating that when misconduct is a manifestation of disability the IEP Team shall return the child to placement absent parental agreement to another placement, "*except as provided in subparagraph (G)*" (emphasis added)). Instead, a special circumstances IAES may remain in place for as many as 45 school days, *id.* § 1415(k)(1)(G), and during that time the IAES "shall be determined by the IEP Team," *id.* § 1415(k)(2).

A parent dissatisfied with the manifestation process, manifestation determination, special circumstances determination, or indeed "any decision regarding placement" may file an appeal. *Id.* § 1415(k)(3)(A). The local school agency also is authorized to appeal, but its ability to file an appeal is confined to situations in which it "believes that maintaining

the current placement … is substantially likely to result in injury to the child or to others." *Id.* An appeal will go before a hearing officer who is required by law to conduct an expedited hearing within 20 school days of the appeal and issue a decision within 10 school days of the hearing. *Id.* § 1415(k)(4).

Pending the decision of the hearing officer, which decision should issue before the expiration of the 45-school-day limit placed on a special circumstances IAES, the child is to remain in the IAES, unless subparagraph (k)(1)(C)[9] calls for a shorter duration or the parents and the agency agree otherwise. *Id.* § 1415(k)(4)(A). This subparagraph (k) stay put is a special exception to the subparagraph (j) stay put that otherwise requires that a child "remain in the then-current educational placement" pending completion of any administrative proceedings. *Id.* § 1415(j).

Before I apply the circumstances of this case to the statutory framework, a word about statutory construction. A federal statute must be construed in accordance with its plain language, avoiding strained interpretations when the statutory language is unambiguous and a natural reading leaves the statutory scheme "coherent and consistent." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016); *Penobscot Nation v. Frey*, 3 F.4th 484, 491 (1st Cir. 2021). Additionally, when construing a statute like the IDEA, a court must be "mindful of 'the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.'" *K.L. v. Rhode*

---

[9] Subparagraph (k)(1)(C) applies to situations in which student misconduct is deemed not to be a manifestation of disability, in which case generally applicable disciplinary procedures determine the duration of a change of placement. Here, subparagraph (k)(1)(C) has no application given that MLD's conduct was determined to be a manifestation of disability.

*Island Bd. of Educ.*, 907 F.3d 639, 644 (1st Cir. 2018) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

The hearing officer framed the § 1415(k) controversy as involving two "inextricably intertwined" issues (issues 4 and 5 of her decision and order): "Whether the District refused to implement the IEP developed … at the January 21, 2020 IEP Team meeting" and "whether the District improperly used the expedited hearing procedures to affect a unilateral removal by insisting that the filings alone changed the Student's placement and altered his stay-put rights." R. 42. As for the propriety of the District's use of the expedited hearing procedure, the hearing officer found that the District reasonably concluded that "the incident of December 9, 2019 continued to risk serious injury to the Student and others and warranted an expedited hearing request." R. 46. She further found that the December 9 conduct supplied the District with cause to file its expedited hearing requests for the purpose of determining whether MLD's return to the behavior program was likely to result in injury. On the hearing officer's interpretation of the IDEA scheme, this meant that the subparagraph (k) IAES in the central office was the stay-put pending the entire administrative review process and, but for the District's closure due to COVID, might have been extended beyond 45 school days by operation of the stay put and by as many as 45 additional school days if her own findings had warranted such an outcome.[10] R. 45-46.

---

[10] The hearing officer found: "Even if the result of the expedited hearing request was that it was not an appropriate IAES, I find that the basis for the filing itself was a legitimate concern for … safety and welfare …, and that the stay-put placement would still have been the IAES until the determination on the merits was issued." R. 46. Ultimately, because Defendant closed its schools in March 2020 before the hearing officer issued a decision, the hearing officer never considered ordering an extension of the central office IAES. The procedural safeguards do not specify what must happen if a hearing officer is not able to conduct a hearing and issue a decision before the expiration of a 45-day, special circumstances IAES. Given the
*(continued next page)*

For reasons that follow, I find error in the hearing officer's findings and conclusion, but I premise my finding on different considerations than those most vigorously advocated by Plaintiffs.

### a. First appeal/request

As to the District's initial request in January for an expedited hearing, Plaintiffs think the hearing officer engaged in an outrageous reading of the IDEA when she found that the request was a proper subparagraph (k)(3) "appeal." In their view, the District was objecting to an ordinary IEP team placement decision and, therefore, an appeal was not warranted. Pls.' Mem. 16.

I am not persuaded by Plaintiffs' argument because, as the hearing officer found, the record would permit a local school agency to conclude that the conduct in question generated a legitimate controversy for purposes of the section 1415(k)(1)(G) special-circumstances procedural safeguard.[11] The existence of that controversy authorized the District to appeal, pursuant to section 1415(k)(3)(A), the January determination of the IEP Team to reinstitute MLD's behavior program placement. The District had cause to file its

_____

stringent expectation for an expedited due process proceeding that achieves both a hearing and a decision within 30 school days—well within the 45-school-day limit for maintenance of a special circumstances IAES—arguably Congress anticipated that no IAES would endure for more than 45 school days, at least not based on mere operation of the subparagraph (k) stay put.

[11] Plaintiffs note that the hearing officer did not attempt to resolve whether the underlying facts demonstrated the existence of special circumstances to support the school administrators' subparagraph (k) actions. Pls.' Reply at 4-5 (ECF No. 20). Plaintiffs are correct that the hearing officer did not attempt to resolve that question. The hearing officer did, however, find that the circumstances gave administrators reasonable cause to seek an expedited hearing based on the existence of special circumstances. R. 47 ("[T]hat issue [—the actual existence of special circumstances—] is not before me. However, I find that the District had the discretion to ask for such a determination by a hearing officer, given the serious nature of the Student's behaviors." (bracketed content added)). See also R. 46 ("I find that the alleged facts at the time showed sufficient cause to warrant the filing of an expedited hearing request ….").

appeal since the statute authorizes an appeal when the agency "believes that maintaining the current placement of the child is substantially likely to result in injury to the child or to others." 20 U.S.C. § 1415(k)(3)(A). I, therefore, agree with the hearing officer that the first appeal was appropriate and disagree with Plaintiffs' contention that no appeal was authorized by the IDEA.

Plaintiffs evidently read section 1415(k) to mean that, once there is agreement that a child's misconduct is a manifestation of disability, "disciplinary" concerns are over and the special circumstances safeguard no longer applies. Pl.'s Mem. 16-20. But whether a proceeding is disciplinary or not does not dictate whether the underlying conduct or behavior "violated a code of student conduct" or whether "special circumstances" may exist to authorize school personnel to appeal what they deem to be a potentially injurious placement decision by the IEP Team. The subparagraph (k) safeguards are concerned more with outlining appropriate administrative consequences for conduct (whether a manifestation or not) than with defining what is or is not a "disciplinary" measure. Accordingly, I agree with the hearing officer that the District did not violate the IDEA when it filed its first appeal under subparagraph (k)(3)(A).

However, although the appeal was authorized by the IDEA, school administrators were not authorized under the IDEA to perpetuate their own, protracted, central office IAES (beginning in December 2019) without an IEP Team determination that the central office was the proper IAES to address the special circumstances removal. *See* 20 U.S.C. § 1415(k)(2). The IDEA clearly placed authority in the IEP Team to determine the appropriate IAES placement related to the special circumstances. *Id.* After all, to the extent

19

subparagraph (k)(1)(G) states that "school personnel may remove a student" based on special circumstances, the term "school personnel" means school personnel acting through the IEP Team, not school administrators acting unilaterally. *See id.* § 1415(k)(2). Any other reading would ignore the clear directive that the IEP Team must determine the IAES during removal. Absent evidence that the IEP Team directed the central office placement prior to the team meeting on February 14, 2020, the District's IAES was not in compliance with the IDEA before that date, even though the District's January 2020 appeal was otherwise authorized by the IDEA.[12]

### b.  Second appeal/request

Following the February 14, 2020 decision of the IEP Team to change MLD's placement to the central office IAES, the District withdrew its appeal. Then, out of concern that the parents' due process request would make the January 2020 IEP the stay-put pursuant to § 1415(j), the District filed a second subparagraph (k) appeal/request to override the subparagraph (j) stay put.

Under these odd circumstances, which developed after the District had already engaged the wheels of expedited due process review, I find that the hearing officer reasonably concluded that the controversy before her was, in part if not on the whole, a special circumstances controversy and that, therefore, application of a subparagraph (k) stay put was appropriate. *See* 20 U.S.C. § 1415(k)(2). Furthermore, as of February 14, the

---

[12] If the District's administrators were unable to secure from the IEP Team a prompt determination that the central office placement was appropriate based on special circumstances, they should have filed an immediate appeal, i.e., much sooner than January 21, 2020.

IEP Team had, in fact, specified that the central office location would serve as the IAES pending identification of a suitable program in a special purpose private school. Although the District had withdrawn its initial appeal, it remained the case that the District (and, as of February 14, 2020, the Team) premised the central office placement on the existence of special circumstances. On that basis the hearing officer reasonably and fairly determined that the IEP Team's February determination should serve as the IAES pending expedited due process review. [13]

### c. Due process and ADA concerns

In support of their position on the foregoing issues, Plaintiffs argue that "[t]he IDEA should not be interpreted in a way that would bring it into conflict with the [Due Process Clause] or the Americans with Disabilities Act." Pls.' Mem. 26. I am not persuaded that application of those separate legal frameworks should drive the process of construing the IDEA. The due process and ADA issues are not fully briefed at this time and the IDEA procedural safeguards are, in fact, both process-heavy and oriented toward the special

---

[13] In their brief, Plaintiffs state that the District "unilaterally removed [MLD] from his last agreed upon educational placement for approximately 36 school days." Pls.' Mem. 22. Elsewhere, citing persuasive circuit court authority, Plaintiff's argue "that the act of simply filing an expedited hearing request was not sufficient to automatically extend the student's removal from school." Pls.' Mem. 25. *See also Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 532 (D.C. Cir. 2019) ("If a school could wait until the 45th day to request a hearing, it could exclude a child for up to 75 days, in direct contravention of the "no more than 45 school days" mandate[.]"). Based on my own calculations using the 2019-2020 school calendar (R. 300), the District filed its second expedited request well within 45 school days of imposing the IAES in December 2019. However, in the leadup to the due process hearing, the hearing officer ruled that the stay put pending her review would be the subparagraph (k)(4) stay put, even though, by that time, it appears likely that she could not have conducted the hearing and issued her decision before the District's IAES had remained in place for more than 45 school days. R. 202-203 (Order Denying Motion to Dismiss and Cross Motion at 16-17). Nothing in this Order should be construed as endorsing that view. Ultimately, closure of the District's schools due to COVID-19 avoided a situation in which the District maintained an IAES for longer than 45 school days based exclusively on the subparagraph (k) stay put and in the absence of a special circumstances finding by the hearing officer. Given that development, offering a ruling on the matter would be nothing more than dicta.

circumstances that sometimes arise involving school safety, notwithstanding a manifestation determination. Accordingly, I conclude that those separate controversies should await future proceedings.[14]

### 2. February 14, 2020 out-of-district placement proposal

At the February 14, 2020 IEP team meeting, the IEP Team not only decided to keep MLD in the central office IAES, R. 21 n.7, but also "proposed to place [MLD] in a behavior program at a special purpose private school," R. 21 (citing R. 650 (Vol. IV)). Because there was no such placement available (at least that the District had yet identified), the District represented that placement at the central office would continue "until a program was found." R. 21. On March 15, 2020, the District closed its schools due to the COVID-19 pandemic and the parties have agreed that their dispute does not extend beyond March 15, 2020.

The hearing officer framed the issue as follows:

ISSUE 6: Whether the District committed procedural violations (failing to have persons knowledgeable about the placement options at the IEP Team meeting; failing to make a clear and specific offer of placement; failing to consider all the factors required by the IDEA when making a placement decision; making a placement offer without knowledge of whether the placement was actually available; and predetermining the outcome prior to the meeting) at the IEP Team meeting on February 14, 2020, which

---

[14] To be sure:

Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(*l*).

significantly limited the ability of the Foster Parents to participate in the development of the IEP.

R. 47.

The hearing officer concluded that a procedural violation was not established because the District (1) did not know where the placement would be at that time, (2) made that fact clear to the foster parents, (3) did not need to have a program representative present at the meeting since no placement was identified, (4) notified the foster parents of the contours of the IEP to be delivered in any out-of-district placement, (5) was still engaged in the design of the IEP which had come to include new and enhanced services, (6) considered the appropriate factors under the IDEA to arrive there, and (7) did not violate the law by not already knowing the placement or predetermining the outcome of the team meeting. R. 47-52.

At the heart of this dispute is a procedural issue as to whether a school agency violates the law whenever its representatives in the IEP Team propose an out-of-district placement before they have the placement lined up for the parents to seriously consider. In *Millay v. Surry Sch. Dep't*, 1:07-cv-178-JAW, 2009 WL 5184388 (D. Me. Dec. 22, 2009), the case chiefly relied on by Plaintiffs, the court found a procedural error where the school agency representatives on the IEP team wrote up an IEP calling for an out-of-district placement at the start of the school year in a specific setting before having anyone from that setting appear at a meeting or otherwise supply meaningful input for the entire team's consideration. *Id.* at *23.

The circumstances of *Millay* are not present in this case. The District did not direct a specific placement that it had not yet secured; it merely found that placement in a more

targeted program was warranted and proposed searching for such a placement. I, therefore, agree with the hearing officer's reliance on Maine Unified Special Education Regulation IX.3.H, *see* R. 48, which regulation recognizes that a school agency will at times need to develop an IEP for an out-of-district placement before it has secured or even identified an appropriate placement. That is a sensible rule that recognizes the challenges that sometimes occur in the IEP development process for children who have needs that exceed the capabilities of their local school agencies. I further conclude that the hearing officer reasonably determined that "the IEP Team was not at the appropriate phase of the decision-making process to discuss the out-of-district options," R. 49, that the District's team representatives "considered all the factors required by the IDEA," R. 50, and "did not predetermine the outcome of the meeting," R. 52.

Accordingly, I reject Plaintiffs' challenge concerning the alleged placement-proposal violation and affirm the hearing officer's findings on this issue in full.

### 3. *Adequacy of remedy*

Recognizing that they "prevailed on several issues below," Plaintiffs argue the hearing officer "failed to order adequate relief … and applied an outdated standard for calculating the relief that was ordered." Pls.' Mem. 34. Plaintiffs request a remand so that the hearing officer can cure the shortcomings they see in the hearing officer's award. *Id.*

A number of substantive findings in the decision and order set the stage for a controversy over the proper award. Between September 12 and October 31, 2020, while MLD was in the behavior program placement, he was suspended for 14 out of 32 school days. During this time, the program was understaffed and in transition. There was one

special education teacher (who endured the brunt of MLD's aggressive behaviors) and one educational technician for six students. The District hoped to locate an out-of-district placement for MLD because it did not believe it could deliver the program he needed. Between September 12, 2020, and March 15, 2020, the District did not provide the full suite of services called for in MLD's IEPs, failing to provide, *inter alia*: BCBA consultation services, social work services, speech and language services, and occupational therapy services. In addition, in its administrative filings Defendant stated that the tutoring program placed no meaningful academic demands on MLD in an effort to avoid escalation and conflict. R. 540 (Vol. IV). Given these facts, the hearing officer found that SMES had failed to provide appropriate services to MLD, ordered compensatory educational benefits for MLD, and imposed certain training requirements for the District's staff.  R. 52.

On the other side of the ledger, experts involved in the development of MLD's IEP in 2020 observed that MLD's history of trauma, multiple changes in foster placement and home setting, and other factors outside the District's control made MLD's consistent engagement in programming in a public school environment "nearly impossible." R. 17, ¶ 58. Indeed, recitation of the background facts that preceded MLD's arrival at the District certainly suggests that the challenges presented may have overwhelmed even a well-staffed special education program.

Because the District did not contest the hearing officer's finding that it failed to provide MLD with a free appropriate public education, and because I find error in certain of the hearing officer's findings, vacatur and remand for further consideration of the

appropriate compensatory education award is appropriate.[15] On remand, the hearing officer or another assigned hearing officer should give due regard to the combined objectives of not only restoring to MLD any specific services that could have been but were not delivered, but also compensating for any progress MLD may have lost due to substantive shortcomings in Defendant's effort to deliver a free appropriate public education. *Pihl v. Massachusetts Dept. of Educ.*, 9 F.3d 184, 187-89 (1st Cir. 1993); *Reg'l Sch. Unit 51 v. Doe*, 920 F. Supp. 2d 168, 207-08 (D. Me. 2013); *see also B.D. v. District of Columbia*, 817 F.3d 792, 798 (D.C. Cir. 2016) (describing "educational benefits that likely would have accrued from special education services the school district should have supplied in the first place"). The hearing officer should conduct further proceedings to enable meaningful consideration of these concerns and also should articulate the rationale behind any award so that the award can be reviewed, if necessary.

## CONCLUSION

For the foregoing reasons, the administrative decision on the IDEA portion[16] of the case is affirmed in part and vacated in part. The IDEA claim (Count I) is remanded for further proceedings consistent with this Order.

**SO ORDERED.**

Dated this 14th day of July, 2022.

/s/ Lance E. Walker
**UNITED STATES DISTRICT JUDGE**

---

[15] A hearing officer's "role … is to enforce the child's 'substantive right' to a FAPE" and no more. *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 754 (2017).

[16] Plaintiffs also assert claims arising under the Title II of the Americans with Disabilities Act (Count II) and the Civil Rights Act, 42 U.S.C. § 1983 (Count III - alleging due process violations).